**Susan Wagner LEISNER et al.,
Plaintiffs,**

v.

**NEW YORK TELEPHONE COMPANY, Defendant.**

No. 72 Civ. 2127.

United States District Court,
S. D. New York.

March 2, 1973.

Harriet Rabb, George Cooper, New York City, Richard Leisner, New York City, for plaintiffs.

Proskauer, Rose, Goetz & Mendelsohn, New York City, by Morton M. Maneker and Howard L. Ganz, New York City [of counsel], for defendant.

MOTLEY, District Judge.

### Findings of Fact and Conclusions of Law

Plaintiffs are all women employed in management level positions with the defendant New York Telephone Company. They have brought this class action pursuant to Title VII of the Civil Rights Act of 1964, as amended, 42 U.S. C. § 2000e et seq. for injunctive relief and damages. They alleged that defendant discriminates against women employed by the New York Telephone Company in management level positions in its traffic departments throughout the state in violation of the statute. Defendant's motion to dismiss the complaint on numerous grounds was denied on November 27, 1972.[1] Plaintiffs' motions for a preliminary injunction and for class action certification are granted for the reasons stated below.

The named plaintiffs are or have been employed in the Southern Manhattan Dial Division. All were hired during the period September, 1970 to September, 1971. They seek to bring this action on behalf of themselves and all women employed in management level positions in the defendant's traffic departments throughout New York State.

The New York Telephone Company is organized into five geographical territories. Within each territory there are

---

1. Defendant had moved to dismiss the complaint on the grounds that: 1) plaintiffs had not properly filed their charges with the New York State Division of Human Rights as required by 42 U.S.C. § 2000e-5(b) ; 2) that only one of the named plaintiffs, Susan Leisner, had received her notice of her right to sue, pursuant to Section 2000e-5(e), prior to commencing her suit in federal court; and 3) that, with respect to plaintiffs' charges of harassment and retaliation those charges had not been properly placed before the EEOC.

As for the first ground, this court ruled that since the state agency had been informed by the EEOC of the plaintiffs' charges, proceedings were commenced in the state agency within the meaning of Section 2000e-5(b). *See* Love v. Pullman Co., 404 U.S. 522, 92 S.Ct. 616, 30 L.Ed. 2d 679 (1972).

With respect to defendant's second ground, the court ruled that since one plaintiff had received her notice of right to sue from the EEOC, the action was properly maintainable. Now that the action has been certified as a class action, see *infra*, the other plaintiffs are now properly before the court even though they commenced this action prior to receiving their notices.

Finally, as for the third ground, the court held that, since the claim of harassment and retaliation allegedly arose from plaintiffs' filing of charges with the EEOC, it was obvious that they could not allege such conduct in their EEOC complaints. Since charges must first be filed with the state agency and then the EEOC so that those administrative agencies can have an opportunity to obtain voluntary conciliation and compliance, the test must be whether the charges in the judicial complaint are within ". . . the 'scope' of the EEOC investigation which can reasonably be expected to grow out of the charge of discrimination." Sanchez v. Standard Brands, Inc., 431 F.2d 455, 466 (5th Cir. 1970). Since counsel for the EEOC informed the court at oral argument that in the course of an investigation it is the routine practice of that agency to investigate possible harassment and retaliation after a charge is filed, there can be little doubt that the agency had an opportunity to seek voluntary conciliation and compliance with respect to the alleged harassment and retaliation.

separate functional units, including a traffic department, which provides operator services and administers the equipment by which telephone calls are routed. Within the Traffic Department of the Manhattan territory there are several divisions, including the Southern Manhattan Dial Division in which the named plaintiffs work or have worked.

Management employees within the traffic departments are placed in various salary grade levels, ranging from Grade 5, the lowest significant management level, to Salary Grade 23. Approximately 38% of the management level employees within the Company are women. This figure reflects the percentage of women in the relevant labor force and has remained unchanged for the past six years. However, within the traffic departments located in the New York Standard Metropolitan Statistical Area, as of December, 1971, the distribution of men and women in management level positions at various salary grade levels was as follows:

| Level | Maximum Salary | Men | Women | Total | % Women |
|---|---|---|---|---|---|
| 5 | $11,400 | 5 | 386 | 391 | 98.7 |
| 6 | 12,300 | 4 | 185 | 189 | 97.9 |
| 7 | 13,300 | 21 | 787 | 808 | 97.4 |
| 10 | 16,800 | 174 | 292 | 466 | 62.7 |
| 21, 22, 23 | 20,700 | 220 | 57 | 277 | 20.6 |

According to the Company's own projections, little significant change in the percentage of women at the higher management levels is to be anticipated in the Company as a whole as distinguished from the traffic departments. In September, 1972, 9.1% of the second-level management employees throughout the Company (Grades 21–23) were women. Defendant estimates that by the end of 1976, 14.5% of its second-level management employees will be women. (Defendant's Exhibit J.)

Within specific job titles, there were more significant disparities in the numbers of men and women. For instance, 73.7% of the women in the higher management levels, Grades 21–23, were classified as traffic supervisors, as compared with only 41.8% of the men. Moreover, defendant classified only approximately 7% of the women traffic supervisors as "officials and managers," persons " . . . who set broad policies, exercise overall responsibility for execution of these policies, and direct individual departments or special phases of a firm's operations." The remaining 93% are classified as "professionals," persons whose occupations require " . . . either college graduation or experience of such kind and amount as to provide a comparable background." [2] By contrast, approximately 27% of the male traffic supervisors are classified as "officials and managers."

Within Level 10, which has several job titles as of December, 1971, 52.7% of the women were chief operators while there was only one male in that position. Ninety-nine percent of the female chief operators were classified by the Company as officials and managers. While chief operators do not make policy decisions, they are the source of recommendations as to changes in operating practices, make payroll decisions and schedule their work force.

By contrast, 48.3% of the males within Level 10 were classified as dial serv-

2. The descriptions are taken from the Equal Employment Opportunity Employer Information Report EEO–1 (Plaintiffs' Exhibit 2.)

ice supervisors. Each dial service supervisor supervises approximately 20 persons and has overall responsibility for the central offices. Dial service supervisors must determine whether equipment in a central office is functioning properly. If they note a problem, they have the responsibility to secure corrective action, often from other departments of the Company. As of September 30, 1972, the average length of service within the Company of dial service supervisors was 8.4 years for males and 23.3 years for females.

In Salary Grade 7, 89.6% of the women were group chief operators, most of whom were classified by the Company as "officials and managers." The group chief operators work under the supervision of the chief operators and are responsible for planning, training and scheduling the work of groups of telephone operators. According to a bulletin once used by the Company to recruit college women, "[t]his is the most popular position among college girls entering New York Telephone." (Plaintiff's Exhibit 6.)

Of the men situated in Level 7, 76.2% were assistant dial service supervisors all "officials and managers."

Assistant dial service supervisors, who work under the dial service supervisors, supervise approximately eight people, and are responsible for spotting indications of deterioration in the offices to which they are assigned. The average length of service within the Company for assistant dial service supervisors was 1.3 years for males and 15.4 years for females as of September 30, 1972.

The Company operates several training and career development programs designed to develop the talents of persons the Company believes to have potential for management level positions. One of the programs, the Nyack Training School, is a five or six week program designed to give dial service supervisors additional technical expertise.

Between June 1, 1970 and June 1, 1972, approximately 18% of those who attended throughout the state were women.[3]

The Management Development Program is designed to permit employees to demonstrate that they have the aptitude for high management level positions. The program affords its participants limited amounts of formal training and participants are expected to demonstrate that they can perform effectively at the higher levels. If, after a period of a year to 15 months, a participant is not adjudged to have the characteristics the Company deems necessary for further promotions, he or she is discharged. From 1965 through 1970, there were only two or three women in the Management Development Program. Between June 1, 1970 and June 1, 1972, approximately 6% of the participants were women (or 20 out of a total of 339). As Dominick Carbone, general personnel supervisor for defendant, conceded, " . . . the program is predominantly male."

Defendant discontinued the Management Development Program in its Manhattan Traffic Department in March, 1972 and replaced it with a Career Development Program. The Company purportedly terminated the Management Development Program in Manhattan because of its failure to attract significant numbers of women and because it wanted to include management people other than those " . . . who had exhibited supervisory interests and had significant technical experience. . . ." The program includes counseling, staff tours, training sessions and testing. About 50% of the participants are women.

Mr. Carbone testified that, in placing persons in management level positions within the Manhattan Traffic Department, employment interviewers consider whether the person is interested in numerical or analytical work, whether the person has proven successful in previous endeavors and, for positions involving

3. The school was closed from the middle of 1971 until March, 1972 as the result of a strike.

significant supervisory responsibilities, whether the applicant has had supervisory experience. The Company considers whether a person has a technical degree in determining his or her interest in and aptitude for technical work but does not consider a technical degree to be a prerequisite for such work.[4] The Company also considers results of various objective tests designed to ascertain leadership abilities and performance evaluations completed by an employee's immediate supervisor. In short, according to Carbone, " . . . we stand back and look at the individual as a total individual, and, 'Is this person going to be successful in our business?' becomes our final criterion after we have all of these factors reviewed."

With respect to the Management Development Program, Carbone testified that applicants " . . . first of all, have to have an express interest in supervisory line management. These individuals have objectively demonstrated skills of leadership. They have come to us with proven 'track' records in the area of supervision or leadership. These individuals have high academic achievements." Carbone noted that the Company has had considerable success in recruiting Management Development Program candidates from the military because "[t]he military . . . tend[s] to give their officers rather immediate roles of responsibility." He testified further that ordinarily teaching is not considered to be significant supervisory experience.

It appears that Company interviewers have considerable discretion in determining whether applicants have the potential for the Management Development Program. On the basis of their training, they must evaluate " . . . how significant this leadership or lack of leadership is." [Carbone, Transcript, p. 253].

Two of the named plaintiffs in this action, Susan Wagner Leisner and Jane Booth, were hired into the Company as assistant dial service supervisors at Grade Level 7. Mrs. Leisner was hired on March 22, 1971. Her first assignment was teaching clerical employees and some management level employees at the management dial training school. During the six months she taught at the school, all but one of her students were female as were all of the other instructors. [Mrs. Leisner was graduated from the University of Pennsylvania in 1968. While there, she was an alumni regional scholar for four years and a member of an academic honor society. She subsequently was a teacher in the Philadelphia school system and worked in the business department of a magazine company for approximately 18 months in New York. At the time she joined the telephone company she had completed four semesters at New York University in postgraduate work toward a Masters degree in business administration.]

On September 9, 1971, Mrs. Leisner filed a charge of sex discrimination with the Equal Employment Opportunity Commission alleging that the Company discriminated against women with regard to hiring and other conditions of employment. The charge was deferred to the New York State Division of Human Rights pursuant to 42 U.S.C. § 2000e–5(b).

Mrs. Leisner charges that, as the result of her filing, various supervisors have warned her that her actions could jeopardize her career at the Company.

However, in May, 1972 Mrs. Leisner was invited to attend the Management Assessment Center for testing. She received the highest of the three possible ratings. The report issued by the Center stated, "Susan demonstrated above average ability in most skill areas.

---

4. Indeed, of the 74 male dial service supervisors employed within the New York Standard Metropolitan Statistical Area as of September 30, 1972 (and hired prior to December 31, 1971), only 16 had technical degrees.

This, combined with her innate ability and high work standards, makes her acceptable for a manager's position." (Plaintiff's Exhibit 5.) She has received an average rating in her job performance evaluation, completed approximately one year after she joined the Company. Mrs. Leisner charges that the "average" rating was in retaliation against her filing of the EEOC charge. She has not yet received any promotions although she has been offered an opportunity to attend the Nyack training school. She is currently on a five-month leave of absence commenced in September, 1972, in order that she might continue her graduate studies.

Miss Booth began working for the Company as an assistant dial service supervisor (Grade 7) in September, 1970. [Plaintiff Booth was graduated cum laude from Fordham University in 1967 with a B.A. degree in History. As an undergraduate, she was elected to membership in an academic honor fraternity, was vice-president of the student government, a member of the Faculty-Student Senate and managing editor of the undergraduate yearbook. From 1967 through 1970, she was a graduate student at the University of Toronto where she obtained an M.A. degree in British History in 1968.]

Like Mrs. Leisner, her first assignment was teaching clerks at the dial training school for approximately six months. She was subsequently assigned as an assistant dial service supervisor in charge of line assignment, responsible for supervising five managers who in turn supervised approximately 35 clerks.

Plaintiff Booth filed a complaint dated March 3, 1972 with the EEOC and the complaint was deferred to the State Division of Human Rights. The complaint alleged that the defendant discriminated against women in its hiring and other conditions of employment.

She was subsequently evaluated at the Management Assessment Center and, like plaintiff Leisner, received the highest of the three possible scores. She also received a superior performance evaluation rating and was subsequently promoted to Grade 10 as a dial service supervisor in charge of line assignment. She also has been offered opportunities to attend the Nyack training school.

The other named plaintiffs filed charges with the EEOC in December, 1971, alleging essentially the same discriminatory practices as those alleged by plaintiffs Leisner and Booth. On May 17, 1972, plaintiff Leisner was issued a notice of right to sue pursuant to 42 U.S.C. § 2000e–5(e) and on August 25, 1972, notices were issued to plaintiffs Gedeon Hurowitz, Malinowski, Milkman, Principe and Wanio. Plaintiffs Gedeon, Milkman, and Principe have alleged harassment and retaliation in response to their complaints filed with the EEOC.

Plaintiffs Hurowitz and Milkman have since resigned from the Company and plaintiffs Malinowski and Gedeon have requested transfers to other Bell System companies. Plaintiffs Wanio and Principe continue in the Level 5 jobs to which they were first assigned upon entering the Company.

Since 1963, the Company has had various programs in effect designed to increase employment of racial minorities and women throughout the Company. The latest Affirmative Action Program was promulgated in 1971 pursuant to the federal contract compliance program. The program pledges the Company "to achieve within a reasonable period of time, an employee profile with respect to race and sex in each major job classification which more or less resembles the relevant labor pool the Company draws upon."

Among the affirmative steps which the Company has taken to expand employment opportunities for women, it has instructed employment agencies used to recruit college graduates to restrict their referrals for the Management Development Program to women and members of racial minority groups and has placed several advertisements demon-

strating the Company's interest in management-level women.

Plaintiffs' motion for preliminary injunction was heard on November 27–30 and December 1, 1972. On January 18, 1973, while plaintiffs' motion for preliminary injunction was under consideration, a consent decree was entered in the United States District Court for the Eastern District of Pennsylvania compelling the affiliate companies of the American Telephone and Telegraph Company, including New York Telephone Company, to take certain affirmative steps to expand opportunities for women and minorities and to award back pay to certain employees. Equal Employment Opportunity Commission, et al. v. American Telephone and Telegraph Company, et al. (E.D.Pa., January 18, 1973) (Higginbotham, J.).

The benefits of that decree are available, however, only to those employees who affirmatively elect to relinquish any complaint of discrimination against the Company in exchange for relief provided by the decree. The most immediate relief appears to be a salary increase for those who elect to be bound by the decree. No promotions are guaranteed. The decree also places a judicial stamp of approval on defendant's Affirmative Action Plan which provides for the establishment of goals by defendant. This plan was received in evidence on the hearing of plaintiffs' motion for preliminary injunction. The decree also appears to bind defendant to utilize only validated employment tests. In any event, the plaintiffs in this action have elected not to participate in the benefits of that decree.

*Preliminary Injunction*

■ Before a preliminary injunction can issue in any case, the moving party must satisfy its burden of showing two factors: 1) a clear probability of success on the merits and 2) the possibility of irreparable injury. Clairol, Inc. v. Gillette Co., 389 F.2d 264, 265 (2d Cir.1968.)

*A. Probability of Success on the Merits.*

■ The court holds that the wide statistical disparities which the court has found in the Company's employment of women in various job categories and training programs places a burden on the defendant to show that the disparities are not the product of discrimination against women on the basis of their sex. *Cf.* Rios v. Enterprise Assn. Steamfitters, 326 F.Supp. 198, 200 (S. D.N.Y.1971) (Frankel, J.).

The Company has offered some explanations for the statistical disparities. It argues, for instance, that one reason why most of the management-level women in the traffic departments are concentrated in Grades 5–7 is that those lower level management positions have traditionally been filled from lower management or non-management ranks "[a]nd this promotional 'pool' is, and has for many years been, heavily populated by females." [Post-Hearing Memorandum of Defendant, p. 13.] The Company further argues that disparities in the length of service of men and women in various job titles are attributable in large part to the fact that many of the women in those positions have been promoted from non-management positions and lack the capacity to be promoted to higher management positions. By contrast, many of the males occupying those same jobs were hired directly into management-level positions and have the educational background and other qualifications necessary for additional promotions.

However, these explanations can account for only some of the statistical disparities since it is obvious that a major factor is the Company's use of non-validated tests and criteria to determine interests and qualifications for various jobs and training opportunities. Indeed, the Company cannot advance the contention so often made in employment discrimination cases that few women have applied for the positions in question since the Company concedes that few

people who enter the Company do so with any particular job in mind. Rather, the interviewers and supervisors play a critical role in determining whether an employee or prospective employee is interested in a particular job.

Indeed, defendant's counsel, when asked why women were concentrated in the lower management levels conceded that he could not yet fully account for the disparities.

Moreover, in Griggs v. Duke Power Co., 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed. 2d 158 (1971), the Supreme Court held that Title VII proscribes " . . . not only overt discrimination but also practices that are fair in form, but discriminatory in operation. The touchstone is business necessity. If an employment practice which operates to exclude Negroes cannot be shown to be related to job performance, the practice is prohibited." *Id.* at 431, 91 S.Ct. at 853. While the Court's holding can be narrowly construed to proscribe only employment practices which tend to freeze a prior pattern of overt racial discrimination, *see id.* at 428, 430, 91 S.Ct. 849, the Court relied in large part on the EEOC Guidelines on Employment Testing Procedures, issued on August 24, 1966, and since elaborated, 29 CFR § 1607. The new Guidelines provide in part:

> Selection techniques other than tests, as defined in § 1607.2, may be improperly used so as to have the effect of discriminating against minority groups. Such techniques include, but are not restricted to, unscored or casual interviews and unscored application forms. Where there are data suggesting employment discrimination, the person may be called upon to present evidence concerning the validity of his unscored procedures as well as of any tests which may be used.

. . . Data suggesting the possibility of discrimination exist, for example, when there are differential rates of applicant rejection from various minority and nonminority or sex groups for the same job or group of jobs or when there are disproportionate representations of minority and nonminority or sex groups among present employees in different types of jobs . . . [29 CFR § 1607.13.]

Thus, the EEOC, whose interpretation of the Act ". . . is entitled to great deference," *Griggs, supra,* at 434, 91 S. Ct. 849, has construed the Act as prohibiting employment screening devices which cannot be validated where there are data suggesting discrimination against women even in the absence of any evidence of overt discrimination in the past. *See* 29 CFR § 1607.3 (definition of discrimination).

In the instant case, there are data showing the under-utilization of women in many management-level jobs. There is also evidence of the use of criteria, such as prior supervisory experience (apparently not including teaching) and technical degrees, although not required, which would appear to disadvantage women. Therefore, the Company would, on the trial of the permanent injunction, have the burden of proving that the criteria were valid, i. e., that ". . . any differential rejection rates that may exist, based on a test, must be relevant to performance on the jobs in question," 29 CFR § 1607.4(a), and, moreover, ". . . that alternative suitable hiring, transfer or promotion procedures are unavailable. . . ." 29 CFR § 1607.3(b).[5]

It seems doubtful that defendant will be able to validate all the criteria which tend to disadvantage women since, apparently, the Company has made little effort to test the validity of its criteria

---

5. As to burden of proof, see *Griggs, supra,* at 432, 91 S.Ct. 849. It is sensible to impose the burden of persuasion as to the validity of criteria which disadvantage women on the employer since it is obviously easier for the employer to prove their worth than for the employee to prove their nonworth. The employer is obviously in a better position to show the skills which are needed for the proper functioning of his business.

before imposing them. Thus, Mr. Carbone was asked how he knew that experience as a military officer was more valuable than experience as a teacher. He replied, "I guess I'm paid to make this type of judgment." He testified that no studies or evaluations had been made to validate this judgment.

Moreover, even if defendant can show that the criteria it uses are valid, it would still be in violation of Title VII if any tests or criteria have been imposed on women ". . . where other employees, applicants or members have not been subjected to that standard." 29 CFR § 1607.11. Given the wide discretion that interviewers and supervisors have to measure the "total person" and to waive some criteria if other criteria are satisfied, it is possible that, at least in some cases, the criteria have been applied more stringently with respect to women.

Thus, the court finds that there is a strong likelihood that plaintiffs will prevail on the merits at the trial.

### B. *Possibility of Irreparable Harm.*

Defendant's counsel conceded, during oral argument, that if the court found that it could ". . . determine with some clarity or probability . . ." that there was a practice of discrimination against women, then ". . . there is irreparable injury." [Transcript, p. 544.]

Unless preliminary injunctive relief is granted, it is certainly possible that qualified women will not be promoted as a result of the Company's use of invalid criteria which disadvantage women. Positions in the interim would be filled and thus unavailable to qualified women even if they succeeded in later obtaining permanent injunctive relief. While back pay might offer some relief, the relief would obviously be inadequate since Title VII prohibits discrimination not only with respect to compensation but also with respect to ". . . terms, conditions or privileges of employment . . .," 42 U.S.C. § 2000e–2(a)(1). Discrimination with respect to terms, conditions or privileges of employment may be difficult, if not impossible, to compensate with money damages.

### C. *Relief Is Not Precluded by Entry of Consent Decree.*

As noted above, (at p. 367), a consent decree was entered in the United States District Court for the Eastern District of Pennsylvania, requiring the New York Telephone Company and other affiliates of the American Telephone & Telegraph Company to implement an affirmative action program and to award back pay to certain employees. Judge Higginbotham, before signing the decree, was careful to note that the order would not prejudice another class action then pending before him which apparently involved members of the class who were to be provided relief by the consent decree.

Moreover, it should be noted that the action pending before this court was filed on May 18, 1972 while the action in the Eastern District of Pennsylvania was filed, answered and the consent order entered all on the same day, i. e., January 18, 1973. At that time there were pending before this court the instant motions for preliminary injunction and class action determination after hearing on same.

Finally, the Second Circuit has held, in Williamson v. Bethlehem Steel Corp., 468 F.2d 1201 (1972), that, for purposes of *res judicata* or collateral estoppel, private citizens were not bound by a prior action brought by the Attorney General ". . . since they neither were parties to it . . . nor have interests such as to be in privity with the Attorney General. . . ."

The court's reasoning obviously applies with equal force to a class action pending after a decree has been entered in an action brought by government agencies since the interests of the class have not been shown to be in privity with those of the federal agencies.

However, this court will avoid granting relief which is merely duplicative of,

or which conflicts with, relief granted in the consent decree.

The court must, therefore, determine whether the relief provided by the consent decree is adequate to protect the members of the class pending the trial of the permanent injunction. The court holds that, while the consent decree appears to be a commendable step toward the enlargement of opportunities for women and members of racial minority groups, it is inadequate to protect the interests of the class in the action pending before this court.

The court notes that the model affirmative action program adopted in the consent decree requires the setting of goals for the broad categories of first, second and third level management.

However, the court has found that plaintiffs probably can show discrimination not only with respect to the hiring and promotion of women into these broad categories of management jobs but also with respect to positions *within* these categories.

While the Statement of Commitment contained within the Affirmative Action Program states that "[i]t is hereby reaffirmed that it is the policy . . . to provide equal employment opportunity in all aspects of the employer-employee relationship . . . to all employees without discrimination because of race, color, religion, national origin, sex or age," it is not clear that the Company is thereby enjoined from discrimination on the basis of sex, as to individual employees, so long as it makes a good faith effort to comply with the broad goals of the Program.

Moreover, section V of the decree provides:

> Each Bell Company may continue to utilize test scores on validated tests along with other job-related considerations in assessing individual qualifications. However, no Bell Company shall rely upon the minimum scores required or preferred on its pre-employment aptitude test batteries as justification for its failure to meet its

intermediate targets for any job classification.

It is not clear whether the decree actually enjoins use of criteria which disadvantage women and which are not both job related and the only suitable means of screening unqualified applicants. *See* p. 368 *supra.* Since this court's interpretation of the decree would obviously not be binding on the court which approved it, the prudent course for this court would be to enter its own decree embodying the terms which it believes are necessary to protect the rights of the much narrower class whose action is pending before it.

D. *Relief.*

For the reasons stated the court holds that a decree preliminarily enjoining defendant from discriminating against any woman employed within its traffic departments at Salary Grade 5 through 23 with respect to any vacancies in management level positions in its traffic departments on the basis of sex is necessary to protect the rights of class members pending the hearing of the permanent injunction. Moreover, the preliminary injunction must bar the use of criteria for the filling of vacancies which are not utilized on an equal basis with respect to men and women, which the defendant cannot demonstrate to be predictive of success in the job, and for which the defendant cannot "demonstrate that alternative suitable hiring, transfer or promotion procedures are unavailable for . . . [its] use." 29 CFR § 1607.3. The decree must apply to all management level positions in the Company's traffic departments.

 The court denies plaintiffs' requests that the named plaintiffs be ordered promoted at this time since there is inadequate evidence that the named plaintiffs are more qualified than eligible males or other members of their class. The court also denies plaintiffs' request that defendant be ordered " . . . to immediately cease hiring or assigning any new employees at, or promoting any incumbent employees to

levels 7 through 25 in the Traffic Department of New York Telephone, pending the outcome of this litigation." Such an order would conflict with the consent decree which requires defendant to take *prompt* steps to promote more women and members of minority groups into vacancies within the Company. Moreover, the court does not believe that a "freeze" is necessary so long as the defendant is enjoined from discriminating against members of the class on the basis of their sex.

■ The court also denies plaintiffs' requests for a preliminary injunction against harassment of the named plaintiffs. The evidence offered at the hearing was insufficient to establish a clear probability of success on the merits as to these charges, especially given the promotion of plaintiff Booth after the filing of her complaint with the EEOC. At any rate, it should be noted that any harassment *or* retaliation against plaintiffs subsequent to the entry of this order would be relevant to any later determination of defendant's good faith in complying with the spirit and letter of the decree.

*Class Relief*

Finally, the court holds that relief as to the class is appropriate at this time even though when the preliminary injunction motion was heard, the class action had not yet been certified. "In the interim between the commencement of the suit as a class action and the court's determination as to whether it should be so maintained it should be treated as a class suit." 3B J. Moore, Federal Practice ¶ 23.50 (2d ed. 1969).

Since the hearing was concerned primarily with general employment practices of the various traffic departments with respect to women seeking management level positions, rather than with reference to the Company's treatment of the named plaintiffs, the court believes that defendant has had an ample opportunity to be heard on the appropriateness of preliminary injunctive relief as to the class.

Plaintiffs move to bring this action on behalf of all other women in the traffic departments of New York Telephone Company in positions which the company defines as "management" level. The number of women in the class is said by plaintiffs to be 2,235.

■ The court holds that a class action is maintainable since plaintiffs have satisfied the requirements of both Rules 23(a) and 23(b)(2):

a) *The class is so numerous that joinder of all members is impracticable.* R. 23(a)(1).

The size of the class plaintiffs seek to represent makes it clear that joinder would be impracticable.

b) *There are questions of law or fact common to the class.* R. 23(a)(2).

The basic factual and legal question common to the claims of each member of the proposed class is whether defendant has a policy of discriminating against women or utilizes criteria which have this effect with respect to certain management-level positions within its traffic departments.

> Defendant argues however, that its "Traffic Department is in reality a collection of a large number of geographical administrative units located throughout the State of New York. There is no executive of the Company or small centralized group which administers a Traffic Department. The Company is organized into a number of Territories and Areas which are in turn subdivided into Traffic Departments, Divisions and Districts which cover the State. Personnel decisions with respect to hiring and promotions are diffused. . . ."

However, even if different personnel may be responsible for hiring and promotional policies in the various traffic departments and divisions, there is the common question of law and fact whether women situated in the various departments have been discriminated against on the basis of their sex by agents of the Telephone Company.

c) *The claims of the representative parties are typical of the class. R. 23(a)(3).*

This pre-requisite merely states in other words the requirements of R. 23(a)(1), (a)(2), and (a)(4). . *See* 3B J. Moore, Federal Practice ¶ 23.-06–1 (1971 Supp.). It does not mean that the claims of the representatives must raise identical questions of law and fact with those raised by the claims of the rest of the class. Rule 23(a)(1) clearly indicates that one common question of law or fact can be sufficient if the other pre-requisites are satisfied. Nor is it fatal if some members of the class might prefer not to have violations of their rights remedied. *See* Norwalk CORE v. Norwalk Redevelopment Agency, 395 F.2d 920, 937 (2d Cir. 1968).

d) *The representative parties will fairly and adequately protect the interests of the class. R. 23(a)(4).*

The interests of the named plaintiffs are essentially coextensive with those of the other class members. They all share a statutorily defined interest in not being discriminated against on the basis of their sex. While different members of the class may be interested in different jobs and may have varying qualifications for the jobs they seek, these factors can be considered in individual proceedings to determine appropriate relief necessary to correct past wrongs.

Moreover, the interests of the representatives must not be antagonistic to those of the rest of the class. *See* Hansberry v. Lee, 311 U.S. 32, 61 S. Ct. 115, 85 L.Ed. 22 (1940). Defendants argue that there is an inherent conflict of interest with respect to plaintiffs' requests for promotions and back pay:

Even if it were shown that a male had unlawfully been hired at a higher job level or promoted to a vacant job in preference to more qualified women, the Court must decide which member of the proposed class would have received the higher level job but for the discrimination . . .

The named plaintiffs and absent members of the proposed class would thus be competing for the available higher positions . . .

However, defendant concedes that the representatives may be able to represent the class adequately with respect to the request for general injunctive relief.

There can be little doubt that individual proceedings will be necessary to decide to what relief each member is entitled should the court find that defendant has acted illegally. The court has discretion at a later time to sever the claims for individual relief from the claim for general injunctive relief pursuant to R. 23(c)(4) and 23(d). While the adequacy of the numerical representation should be considered— in this case the representative parties are but a minute proportion of the proposed class—size alone should not be a determinative criterion. *See* Eisen v. Carlisle & Jacquelin, 391 F.2d 555, 563 (2d Cir. 1971) ; 3B J. Moore, Federal Practice ¶ 23.07 [4] (2d ed. 1969). It seems obvious that " . . . the quality of the representation is more important than numbers. . . . " C. Wright, Federal Courts § 72 (1970).

Instead, one of the most important factors in deciding the adequacy of the representation is whether the party's counsel is " . . . qualified, experienced and generally able to conduct the proposed litigation." *Eisen, supra,* at 562.

Counsel has had extensive experience in sex and race discrimination cases.[6] Moreover, the court has observed and the record will reflect the skill of

---

6. Attorneys Rabb and Cooper are on the staff of the Employment Rights Project, 435 West 116th Street, New York, New York.

plaintiffs' counsel in the proceedings already completed in this action.

e) *The party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole. R. 23(b)(2).*

In addition to satisfying the pre-requisites for a class action set forth in R. 23(a), plaintiffs satisfy the requirements of R. 23(b)(2). That rule has been used most frequently in civil rights cases where, as here, it is alleged that a defendant has discriminated against the members of the class on the basis of their race or sex.

Plaintiffs seek general injunctive relief on behalf of the class and it seems clear that, if the court should find that defendant has discriminated against members of the class, general injunctive relief barring discrimination against members of the class would be appropriate. Therefore, the requirement of R. 23(b)(2) that " . . . final injunctive relief or corresponding declaratory relief with respect to the class as a whole . . ." be appropriate is satisfied. While plaintiffs also seek individualized relief in the form of promotions and back pay, it appears that the request for general injunctive relief will be predominant. The comments to R. 23(b)(2) make it clear that requests for individualized relief will not preclude class certification: "The subdivision does not extend to cases in which the appropriate final relief relates *exclusively or predominantly* to money damages." Committee Note of 1966 to Rule 23(b)(2) (Emphasis added).

*Norwalk CORE, supra,* does not stand for the proposition that a 23(b)(2) class action cannot concern itself with individualized relief. Rather, in holding that the plaintiffs' complaint did not request " . . . ultimately that the Court concern itself with the particular circumstances of each displacee's relocation," the Second Circuit held that there were common questions of law or fact within the meaning of 23(a)(2). The Court did not suggest that requests for individualized relief would preclude class action certification under Rule 23(b)(2).

Defendant contends that the court should exercise its discretion in determining whether class action status is appropriate and deny the motion on the ground that the Attorney General of New York State has already filed a complaint with the State Division of Human Rights seeking similar relief and that the consent decree entered in the Eastern District of Pennsylvania already provides relief to the proposed class in this action.

In his complaint, the State Attorney General has alleged that defendant employs female management employees at lower levels than men. Defendant argues that with respect to the State Attorney General's complaint, the possibility of conflicting results in the two actions, the prejudicial impact of a class action on conciliation proceedings in the state agency, and the lack of any need for a class action "for the same purposes by private parties" militate against class certification.

The considerations which the defendant advances might well be relevant if the class action were being brought under Rule 23(b)(3). Among the factors which a court is directed to consider in deciding whether a Rule 23(b)(3) class action is " . . . superior to other available methods for the fair and efficient adjudication of the controversy" are the following: " . . . extent and nature of any litigation concerning the controversy already commenced by or against members of the class . . . [and] the desirability or undesirability

of concentrating the litigation of the claims in the particular forum. . . . " However, these considerations do not apply to Rule 23(b)(2) class actions. It seems clear that Rule 23(b)(2) allows a court less discretion to decide whether a class action is appropriate than does Rule 23(b)(3). Moreover, it is doubtful that, even under Rule 23(b)(3), the action of the Attorney General or the consent decree would preclude class action certification. In Williamson v. Bethlehem Steel Corp., 468 F.2d 1201 (1972), the Second Circuit held that, for the purposes of res judicata or collateral estoppel, private plaintiffs suing under Title VII were not bound by a prior action brought by the Attorney General of the United States since ". . . they neither were parties to it . . . nor . . . [had] interests such as to be in privity with the Attorney General."

Since an executive officer's interests may be somewhat different from those of private parties seeking to enforce their rights under Title VII, a state attorney general's lawsuit should not preclude private parties from seeking relief.

While there is no reason to doubt the Attorney General's commitment to securing relief for female management-level employees, his limited budgetary resources and the fact that he is challenging the defendant's employment practices with respect to women at all job levels, make it difficult for the court to assume that he can give the interests of the proposed class the same priority as can the representatives in this action.

Finally, the Attorney General's complaint is before an administrative agency. Therefore, whatever policies of comity might underlie a court's deferring to a class action already commenced in another court are inapplicable here. The deferral of plaintiffs' complaints to the human rights agency satisfied the statutory requirements designed to permit state human rights agencies to resolve civil rights complaints before private parties are permitted to apply to the EEOC and the federal courts for relief.

As for the consent decree, as stated above, plaintiffs have stated on the record here their dissatisfaction with the relief awarded. Given the distinct interests of the Attorney General, the Secretary of Labor and the EEOC, court does not believe that plaintiffs should be barred from seeking additional relief on behalf of the proposed class.

■ The court notes that it has inherent power to stay the action pending before it in the interests of economy of time for the court, counsel and the litigants. See Landis v. North American Company, 299 U.S. 248, 57 S.Ct. 163, 81 L.Ed. 153 (1936); Schiff v. Metzner, 331 F.2d 963 (2d Cir. 1964), cert. denied, 379 U.S. 881, 85 S.Ct. 150, 13 L.Ed.2d 88 (1964). If it later appears that essentially redundant lawsuits are unfairly burdening defendant, the court will entertain a motion to stay the class action. See generally 3B J. Moore, Federal Practice, ¶ 23.93 (2d ed., 1969).

■ Finally, that, prior to the filing of the complaint in this Court, only one of the named plaintiffs had received notice from the Equal Employment Opportunity Commission that it had been unable to secure voluntary compliance, a prerequisite to the filing of a civil suit under Title VII, 42 U.S.C. § 2000e–5, does not bar class action certification. The court agrees with the holding in Hicks v. Crown Zellerbach Corp., 49 F.R.D. 184 (E.D.La.1968), reaff'd in part, terminated in part, 321 F.Supp. 1241. There the Court held that, although Title VII does not expressly provide for class actions and provides that suit may be brought only by "the person . . . aggrieved" who has filed a charge with the Commission, ". . . reasonable interpretation and sensible administration of the Act require that class actions be permitted under appropriate circumstances, that is, where the alleged violations complained

of to the Commission are of a general nature and raise issues which are not restricted to the one person who sought the aid of the Commission." 49 F.R.D. at 188.

The Court noted that Congress required charges to be filed first with the Commission so that it could have an opportunity to secure voluntary compliance on the part of the employer. *See* 42 U. S.C. § 2000e–5(e). As the Court observed:

> The charge is filed because an individual feels that rights given him by the Act have been denied him by his employer. Undoubtedly, the complainant is mainly, and perhaps solely, concerned with the effect that denial has upon him personally. However, where the denial of rights alleged by the complainant would appear to arise from the policy of an employer which has widespread application and would affect other persons . . . it is not conceivable that Congress intended the conciliation efforts to be directed solely at obtaining agreement by the employer to grant to the individual complainant his statutory rights. Rather, it would seem beyond dispute that Congress intended the Commission to address its conciliation efforts to the rectification of the general policy enforced by the employer.

Thus, once the state agency and the EEOC have had an opportunity to seek voluntary action to correct the general policies of discrimination alleged in an individual's complaint, those affected by such general policies should be able to seek judicial relief. It should be noted that, in their EEOC charges, plaintiffs charged defendant with a general policy of discriminating against women in management-level positions in the traffic departments. Therefore, the claims made by members of the class are within the penumbra of the charges filed with the Commission.