**Doris FALKENHEINER**

v.

**LEGAL AID SOCIETY OF BATON ROUGE, INC.**

Civ. A. No. 75–140.

United States District Court, M. D. Louisiana.

June 8, 1979.

Sylvia Roberts, Baton Rouge, La., for plaintiff.

James D. Thomas, II, Dodd, Barker, Avant, Wall & Thomas, Baton Rouge, La., for defendant.

E. GORDON WEST, District Judge:

This case involves an alleged violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e–2.

The plaintiff, Doris Falkenheiner, contends that the defendant, Legal Aid Society of Baton Rouge, Inc., on two separate occasions, refused to appoint her as the Executive Director of that agency solely because of her sex. She contends that she was in all respects qualified for the position she sought.

The plaintiff, a licensed attorney, began working for the defendant, Legal Aid Society of Baton Rouge, Inc., in September of 1967 as a staff attorney. In May of 1969 she was appointed to the position of Assistant Director, a position which she held until 1977. During that time, for a three and one-half month period from February 1 to May 15 in 1972, she served as the Acting Executive Director of the defendant agency.

The first alleged act of sex discrimination occurred while she was so serving as Acting Executive Director. As Acting Executive Director the plaintiff was instructed to advertise and take applications for the vacant position. She also applied for the job. Several applications were seriously considered by the Board of Directors of the defendant. Among those seriously considered were the plaintiff and Mr. Edwin M. Callaway. Mr. Callaway was eventually selected as the Executive Director in May of 1972 and plaintiff was reassigned to her old position of Assistant Director.

Mr. Callaway resigned in January of 1974. Once again plaintiff, along with Col. Howard Bushey and two staff attorneys, applied for the position. Col. Howard Bushey was eventually selected as the Executive Director, whereupon plaintiff then filed a grievance with the Equal Employment Opportunity Commission contending that she was a victim of sex discrimination due to having been turned down twice for the position of Executive Director for the defendant, Legal Aid Society. She was granted a sixty day right to sue letter and she filed her suit timely in this Court.

 For the reasons more particularly expressed below, this Court finds that the Legal Aid Society of Baton Rouge, Inc. has committed no acts of sex discrimination against the plaintiff, and that therefore plaintiff's suit should be dismissed.

*The 1972 Incident:*

The evidence before this Court leads to the inevitable conclusion that there were several occurrences, entirely unrelated to sex, before and during the plaintiff's appointment as Acting Executive Director which were justifiable reasons for the Board not appointing her permanently to the position of Executive Director.

On February 1, 1972, the plaintiff was appointed as Acting Executive Director until such time as the Board of Directors could evaluate the applications and make its choice for a new successor. The plaintiff had previously been serving as the Assistant Director since May of 1969. Shortly after the plaintiff had ascended to the Acting Executive Director position three employees staged a walkout and picketed the main office of the defendant due to conflicts with the plaintiff. From the evidence adduced at trial, this Court finds that the basis of the conflicts were the plaintiff's inability to effectively motivate, lead and counsel the three employees. During the entire history of the defendant organization there had never before been any employee action of this type. The members of the Board of Directors were understandably upset with this incident. The plaintiff immediately terminated all three employees for their actions in the walkout and for other reasons. One of the employees had apparently failed to do some work assigned to her and had apparently mismanaged some client funds. Another employee, who had a job on the side, had, on occasion, worked on this part-time job during regular office hours. The third employee was apparently merely disgruntled with the plaintiff because she sought reinstatement, which the plaintiff later granted.

Testimony indicated that this walkout was probably the main factor which prevented the plaintiff from being selected as the Executive Director. The plaintiff alleged in court and in a post-trial brief that the employees walked out only because plaintiff was a woman. Therefore, according to plaintiff, if we condone the Board of Directors' action, which was influenced to some degree by the walkout, then we are admitting that a claim for sex discrimination is present. Such is not the case. There was no evidence offered at trial to support the plaintiff's position, but even if there had been, the two events are separate and distinct. From the evidence in this case, the only logical conclusion which this Court can draw is that the plaintiff was either incapable, inadequate, or improper in the manner in which she managed, reprimanded or counseled these three employees.

 It is not sex discrimination for an employer to determine that a manager, who happens to be a female, should not be pro-

moted when that female manager has demonstrated inabilities or inadequacies while interimly placed in the very position to which she now seeks appointment. This is a cold and calculated objective thought process whereby an employer evaluates an individual for his or her administrative and managerial abilities and determines, based on "facts," that this person is not as qualified as another applicant. Simply because a man is chosen over a woman is not grounds to conclude that sex discrimination is involved. It is only when the employer has based his opinion or choice on stereotypical ideas or ideologies, or has chosen a lesser qualified male over a more qualified female that allegations of sex discrimination become worthy. Such is not the case here. The Board of Directors of the defendant organization had a more than adequate reason for deciding that the plaintiff was not the right person for the position of Executive Director. The very name of the position which the plaintiff sought, Executive Director, indicates what the individual who holds this position is supposed to do: "Direct" the efforts of this organization toward the attainment or achievement of its goals and objectives. The plaintiff had, in a very short time as Acting Executive Director, demonstrated to the Board of Directors that she was, to some degree, deficient in her ability to "direct" the defendant's organization. This is a sufficient basis upon which the Board of Directors could decide against the plaintiff and is totally removed from the stench of any sex discrimination.

*The 1974 Incident:*

The plaintiff alleges as a second count of sex discrimination that the failure of the Board of Directors of the defendant organization to select her as the Executive Director in 1974 was a violation of 42 U.S.C. § 2000e–2. Mr. Edwin M. Callaway was appointed Executive Director in 1972 and resigned in 1974. After this resignation the defendant once again sought applications from qualified individuals to fill the vacancy. The main applicants were the plaintiff, Mr. Jerry H. Smith, Mr. Raymond L. Simmons, and Col. Howard W. Bushey. Mr. Smith and Mr. Simmons were both staff attorneys with the defendant. After careful consideration of all applicants, the Board of Directors appointed Col. Howard W. Bushey as its Executive Director.

In evaluating the selection of Col. Bushey over the plaintiff, this Court is compelled to base its determination on the testimony and facts adduced at trial. The testimony of Professor Raymond L. Lamonica, Mr. Donn Moss, Professor George Pugh, and Mr. Holliday, all members of the Board of Directors, indicated that not only was "sex" of absolutely no import in their decision, but that the selection of Col. Bushey over the plaintiff was based solely on objective factors which strongly indicated that Col. Bushey would be a better administrator, manager, counselor, and leader than the plaintiff.

Professor Lamonica testified that the one criteria which he felt was the most critical was "administrative ability." After the tenure of Mr. Callaway and the other prior directors, Professor Lamonica was looking for a "change in leadership." In his inquiry into Col. Bushey's past experience, he learned that Col. Bushey had retired from the military service after twenty years. He had served in the Adjutant General section of the United States Army. Professor Lamonica testified that he felt general administrative skills were "transportable," thereby making Col. Bushey's vast military experience quite noteworthy. The plaintiff has argued that the failure of Col. Bushey to have any prior legal aid administrative experience is indicative of sex discrimination against her. In this regard, Professor Lamonica testified very forcefully that at this particular time, 1974, he considered prior legal aid experience to be a "detriment" to an applicant. The basis for his feelings was that he, as well as most of the other board members, were looking for a total change from the old guard. In Professor Lamonica's mind the plaintiff represented the status quo of a stagnant organization, whereas Col. Bushey represented a refreshing new change and a chance to inject some "new blood" into the program.

Mr. Donn Moss, another member of the Board of Directors, had much the same feeling as Professor Lamonica. Mr. Moss was not at all concerned with Col. Bushey's alleged inexperience with a legal aid office setup. He felt that on paper the plaintiff and Col. Bushey appeared to be about equal. However, in evaluating the two for real practical administrative abilities, Mr. Moss felt Col. Bushey was far better. Certainly one factor in Col. Bushey's favor was his lengthy military service in the branch of the service which is primarily concerned with "administration." And just as certainly, one of the things that militated against the plaintiff was the fact that under no prior Executive Director had there ever been any employee uprising. Yet, during a short three and one-half month tenure as Acting Executive Director, the plaintiff had been directly involved, and indeed might have been the catalyst, in the first walkout and picketing by employees of the Legal Aid Society of Baton Rouge, Inc. These factors all combined to leave Mr. Moss with the logical selection of Col. Bushey as Executive Director in 1974.

Mr. Holliday was another member of the Board of Directors who corroborated the prior testimony of the other board members. Mr. Holliday listed six factors he considered important in the selection of an Executive Director:

(1) Experience,
(2) Administrative ability,
(3) Prior administration,
(4) Legal aid philosophy,
(5) Leadership ability, and
(6) Ability to motivate.

This Court takes notice of the fact that none of the six categories listed have sex discrimination overtones. Also, the list does not emphasize prior legal aid experience as a determining factor, but merely one of many to be considered.

In Mr. Holliday's testimony he seemed quite insistent that it was important that the next Executive Director have a proper legal aid "philosophy." Mr. Holliday viewed the function of the legal aid organization to be that of providing legal services

for the poor. In his testimony, Mr. Holliday said he found that the plaintiff was more concerned with law reform and class actions designed to bring about social change than she was with providing legal aid to the poor; whereas Col. Bushey was first and foremost concerned with providing full legal services for indigent people. Thus, in Mr. Holliday's mind, Col. Bushey was much more in line with his own legal aid philosophy than was the plaintiff.

Mr. Holliday mentioned another fact which he felt had been established against the plaintiff. Based on prior actions he felt that the plaintiff lacked leadership qualities. In his opinion the plaintiff was not capable of motivating people without offending them. Therefore, based on all of the above, Mr. Holliday felt that the plaintiff was managerially unsuited for the job and that Col. Bushey was the better qualified person for the position of Executive Director.

The last member of the Board of Directors to be called was Professor George Pugh. In his testimony Professor Pugh flatly stated that there was absolutely no sex discrimination involved in the actions taken by the defendant. In other words, sex was of no consequence to the defendant in its selection process. During his testimony the one factor which continued to crop up as the real reason for the plaintiff not being appointed was her "inability to administer the personnel." Professor Pugh had had a prior conversation with a previous Executive Director, Ms. Gwendolyn Crockett, wherein Ms. Crockett had stated she was "unsure" of the plaintiff's ability. This statement by Ms. Crockett, made in 1972, was solidified by the employee walkout, picketing, and other reports of personnel dissatisfaction which Professor Pugh said he became aware of. Therefore, it is apparent from the testimony in this case that plaintiff, by her own actions, demonstrated that she lacked the managerial and administrative qualities deemed necessary by the members of the defendant's Board of Directors for one to fill the position of Executive Director of the organization.

The vote was apparently unanimous. There is absolutely no evidence of any kind that sex played any part in the selection.

*The Law*:

It is incumbent upon the Court to carefully scrutinize the evidence to determine whether or not there is any indication of any kind that the defendant has, in the past, engaged in any employment practices that might indicate a pattern of sex discrimination. In *Swint v. Pullman-Standard*, 539 F.2d 77 (CA 5—1976), the Fifth Circuit held that:

"The most important aspect of determining whether a prima facie case has been proven is to identify the proper scope of the evidentiary examination. The authorities speaking to this scope all conclude that the question should be whether the class has established a history of broad patterns of plant-wide racially discriminatory departmental assignments." Supra at 93.

The Court in *Swint* went on to say that: ". . . the prior history of discriminatory job class assignments is clearly relevant to the issue of whether the present discrepancies in departmental assignments were part and parcel of a broad scheme to treat black and white workers differently." Supra at 97.

While *Swint v. Pullman-Standard*, supra, dealt with racial discrimination, the legal principles are transferable to a case dealing with "sex" discrimination. Therefore, this Court should look to the "past history" of the gender of those who have held the position of Executive Director for the defendant, Legal Aid Society of Baton Rouge, Inc. The admitted facts are that there have been six Executive Directors in the defendant's history. Two have been females and four have been males. It should be noted that the plaintiff herself served as Acting Executive Director from February 1, 1972 until May 15, 1972, thus making the actual number of female Executive Director's three out of seven. Based on these facts, this Court concludes under the *Swint v. Pullman-Standard*, supra, rationale, that there is no evidence whatsoever of any historical "sex" discrimination by the defendant. The plaintiff has not carried this burden of proving a prima facie case.

The case of *Peters v. Jefferson Chemical Company*, 516 F.2d 447 (CA 5—1975), which dealt with sex discrimination in employment, held that the proof needed to establish a prima facie case of sex discrimination is not discriminatory intent by the employer. The proof encompasses only a demonstration that the "effect" of the employer's employment practices was discriminatory. As applied to this case the facts totally fail to indicate any "effect" toward discriminating against females in general, or against the plaintiff in particular. Quite the contrary, if the plaintiff is included in the total number of Executive Directors, the defendant has appointed females three times out of seven to fill the position of Executive Director.

The plaintiff in this case must prove that: (1) she belonged to a protected minority, (2) she applied for the job in question, (3) she was qualified for the position, (4) she was rejected for the position, and (5) that further applicants were sought.

The plaintiff has failed in regards to numbers (3) and (5). The testimony elicited at trial established that during her tenure as Acting Executive Director the plaintiff demonstrated, along with other things, a lack of managerial and administrative skills and an inability to deal with people. These are two crucial traits and it is imperative that anyone appointed as Executive Director of the defendant's organization possess these attributes, as a minimum. The plaintiff did not possess these qualities, according to the testimony at the trial, and was, therefore, deemed to be "not qualified" by the members of the Board of Directors.

Also, the defendant did not seek any further applications for the job. On each occasion there were sufficient qualified applicants from which the Board of Directors could make a choice. See also *Saracini v. Missouri Pacific Railroad Company*, 431 F.Supp. 389 (D.C.Ark.—1977).

Plaintiff cites the *Saracini* case as authority for the requirements placed upon the defendant when the plaintiff has established her prima facie case. However, the Court finds that the *Saracini* case is not applicable because the plaintiff never established a prima facie case. As previously mentioned, the testimony and evidence elicited at the trial indicated that the plaintiff was *not* qualified for the position of Executive Director. The determination of "non-qualification" for the position was made by all of the members of the Board of Directors who were called to testify. The basis for their decision was the overwhelming personnel problems which had been non-existent before the plaintiff was appointed Acting Executive Director. Perhaps had the plaintiff not been placed in such a pinnacle type position where her true administrative and managerial capabilities would be immediately observable she might have been selected by the defendant. However, in this interim or trial period the Board of Directors had an opportunity to observe the plaintiff's qualities. Their evaluation, as testified to at the trial, was that the plaintiff was *"not"* qualified. At both times when the plaintiff applied for the position there were "qualified" applicants from which the defendant made its choice. Therefore, the burden of proof never shifted to the defendant.

The plaintiff takes issue with the partially "subjective" nature of the selection process used by the defendant's Board of Directors and cites *Rowe v. General Motors Corp.*, 457 F.2d 348 (CA 5—1972), and *Robinson v. Union Carbide Corp.*, 538 F.2d 652 (CA 5—1976). While the *Rowe* case has some similarities with our present case this Court finds *Rowe* to be easily distinguishable. In *Rowe* the procedures used for promotion and transfer set forth absolutely no written instructions for the foremen to follow. In the instant case the qualifications which the Board of Directors must use are clearly and plainly set forth in the defendant's Work Program. Without listing the entire qualifications there are two which are pertinent: (1) superior ability, and (2) the capability of providing leadership for the entire program staff. It is in these two areas that the plaintiff, according to the evidence and testimony at the trial, proved to be unqualified for the position. Also, in *Rowe v. General Motors Corp.*, supra, the Court cited testimony by several General Motors foremen to the effect that they did not know what management was looking for in candidates for jobs. Such is not the case in the plaintiff's situation. Each of the members of the Board of Directors articulated extremely well the type of Executive Director which they, as a whole, were looking for. In *Robinson v. Union Carbide Corp.*, supra, the defendant employer had used subjective evaluations of job candidates which the Court found allowed for "an intolerable occurrence of conscious or unconscious prejudice." (538 F.2d, at 662). Such is not the case here. The procedure in *Robinson* was very unlike the procedure used in the instant case. In *Robinson* the evaluators selected the applicants, whereas in the present case the field was open to all interested and qualified persons. In *Robinson* the evaluations were conducted by a vast array of different level managers and supervisors with very little guidance on how to evaluate a candidate. This factor is not present in the case at bar.

Therefore, *Rowe v. General Motors Corp.*, supra, and *Robinson v. Union Carbide Corp.*, supra, stand as support for the determination by the defendant not to hire the plaintiff as its Executive Director.

*Sprogis v. United Air Lines, Inc.*, 444 F.2d 1194 (CA 7—1971), which is cited by the plaintiff is also inapposite to the present case. The *Sprogis* case dealt with a "no-marriage" rule which the Court found discriminatory since it only applied to women and not men. This type of situation is absolutely non-existent in the plaintiff's case. The qualifications needed to be appointed Executive Director are the same for both male and female. The testimony from each of the members of the Board of Directors indicated that these qualifications had been applied to all prior Executive Directors whether they were male, female, black, white, etc. The Board of Directors

was merely looking for a "qualified person" to serve as its Executive Director. The plaintiff was found to be "not qualified" as a *person*, not as a female, based on the testimony produced at the trial.

The plaintiff cites numerous cases for the proposition that non-uniform and unequal application of employment criteria by an employer is discrimination. *Kinsey v. First Regional Securities, Inc.*, 181 U.S.App.D.C. 207, 557 F.2d 830 (1977), and *Wade v. Mississippi Cooperative Extension Service*, 528 F.2d 508 (CA 5—1976). But in a sex discrimination case it is the burden of the plaintiff to establish, in her prima facie case, that she was, in fact, the victim of "sex" discrimination, and this is true whether the discrimination is a clearly discriminatory job requirement or the non-uniform and unequal application of employment criteria. The plaintiff has totally failed in this regard. She failed completely to establish any non-uniformity or unequal application of the criteria used by the Board of Directors in hiring its Executive Director. The testimony was entirely to the contrary.

Plaintiff urges this Court to hold that the actions of the Board of Directors in not hiring her, while appearing to be non-discriminatory, are really pretextual in nature and, therefore establishes her claim of "sex" discrimination. *Pond v. Braniff Airways, Inc.*, 500 F.2d 161 (CA 5—1974). However, according to the *Pond* case:

". . . where an employer can demonstrate no discrimination in the selection or advancement of employees, but rather that the employer in the best of faith merely weighed each person's talents then choosing the man over the woman (or the woman over the man), no case is made out under Title VII." At p. 165.

Based on the evidence presented at trial, this Court is firmly of the opinion that this is exactly what the defendant did in this case. Of course, the Court in *Pond* goes on to say that:

". . . the inquiry does not necessarily stop here. Courts must be extremely careful to determine that the reasons given for selecting a male applicant over a

female applicant are not simply a ruse disguising true discrimination. Courts must further carefully scrutinize the employer's explanations for its conduct *once the aggrieved employee has proved a prima facie case of discrimination.*" Supra, at p. 166. (Emphasis added.)

Following this statement of the law, it is concluded that:

(1) the Board of Directors of the defendant demonstrated no sex discrimination toward the plaintiff in not selecting her on either of the two occasions, 1972 and 1974, when she applied for the position of Executive Director;

(2) the defendant has had two women as Executive Director before the plaintiff, and three women if the plaintiff's tenure as Acting Executive Director is considered, therefore, no history of "sex" discrimination has been established;

(3) the plaintiff never established a prima facie case;

(4) the reasons stated by each and every one of the members of the Board of Directors were legitimate business criteria that was in written form and was not vague or ambiguous;

(5) these same legitimate business criteria were in use when the two prior females were appointed as Executive Director and they had no problem in being approved under these same criteria;

(6) of the members of the Board of Directors who testified, all affirmatively stated that the male versus female issue was *"never"* even considered by them in evaluating the applicants;

(7) that no member of the Board of Directors who testified gave any indication whatsoever of any "stereotyping" of the various males or females who made application for the position; and

(8) the plaintiff's three and one-half month tenure as Acting Executive Director gave the members of the Board of Directors the opportunity to observe her in the performance of the duties of the Executive Director, and that during this period several managerial problems and more importantly "employee" problems

surfaced due to the plaintiff's inability to adequately "manage" the business and "lead" and "motivate" the employees who worked for the defendant.

Therefore, under the test established in *Pond v. Braniff Airways, Inc.*, supra, the plaintiff has failed to prove, even to a prima facie degree, a case of "sex" discrimination.

Lastly, the plaintiff cites *Leisner v. New York Telephone Company*, 358 F.Supp. 359 (D.C.N.Y.—1973), as authority for the discriminatory effect, as regards sex, that the consideration of military experience had on the plaintiff. Once again this Court finds that a case cited by the plaintiff, this time the *Leisner* case, merely helps support the actions of the defendant. The Court in *Leisner* did not say that it was "discriminatory" to consider military experience, which was seen as potentially favoring men. What the Court did say was that to consider "military" experience on the one hand, but *not* to consider "teaching" experience on the other hand, had the effect of placing men with military experience in a preferential position over a woman with teaching experience. Such is not the case here. In the first place, it was never established that the plaintiff had any teaching experience which could be considered by the Board of Directors. Second, and most importantly, the *Leisner* case could carry more weight if it were not for the fact that the plaintiff, during her tenure as Acting Executive Director, had established that regardless of what prior experience she had, military, teaching or otherwise, she was "not qualified" for the position of Executive Director. The Board of Directors merely used the vast and extensive military experience of Col. Howard W. Bushey as a probable indication that he could adequately perform the duties of Executive Director. Thus, *Leisner v. New York Telephone Company*, supra, while partially applicable to the case at bar, serves to further emphasize the facts and testimony offered at trial. It is not a question of the defendant failing to recognize some training or experience which the plaintiff possessed, while at the same time recognizing it for a male applicant. It is

more a case of the plaintiff having been placed in the very position she sought for an interim period and while in that position affirmatively demonstrating to the defendant her inability to effectively administer and manage the Legal Aid Society of Baton Rouge, Inc.

Therefore, for the foregoing reasons, it is the opinion of this Court that the plaintiff's claim of "sex" discrimination has not been established, and judgment will be entered herein accordingly.