(Slip Opinion)     OCTOBER TERM, 2010          1

Syllabus

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is
being done in connection with this case, at the time the opinion is issued.
The syllabus constitutes no part of the opinion of the Court but has been
prepared by the Reporter of Decisions for the convenience of the reader.
See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## WAL-MART STORES, INC. *v.* DUKES ET AL.

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

No. 10–277.   Argued March 29, 2011—Decided June 20, 2011

Respondents, current or former employees of petitioner Wal-Mart, sought judgment against the company for injunctive and declaratory relief, punitive damages, and backpay, on behalf of themselves and a nationwide class of some 1.5 million female employees, because of Wal-Mart's alleged discrimination against women in violation of Title VII of the Civil Rights Act of 1964.  They claim that local managers exercise their discretion over pay and promotions disproportionately in favor of men, which has an unlawful disparate impact on female employees; and that Wal-Mart's refusal to cabin its managers' authority amounts to disparate treatment.  The District Court certified the class, finding that respondents satisfied Federal Rule of Civil Procedure 23(a), and Rule 23(b)(2)'s requirement of showing that "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole."  The Ninth Circuit substantially affirmed, concluding, *inter alia,* that respondents met Rule 23(a)(2)'s commonality requirement and that their backpay claims could be certified as part of a (b)(2) class because those claims did not predominate over the declaratory and injunctive relief requests.  It also ruled that the class action could be manageably tried without depriving Wal-Mart of its right to present its statutory defenses if the District Court selected a random set of claims for valuation and then extrapolated the validity and value of the untested claims from the sample set.

*Held*:

   1. The certification of the plaintiff class was not consistent with Rule 23(a).  Pp. 8–20.

     (a) Rule 23(a)(2) requires a party seeking class certification to

prove that the class has common "questions of law or fact." Their claims must depend upon a common contention of such a nature that it is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke. Here, proof of commonality necessarily overlaps with respondents' merits contention that Wal-Mart engages in a pattern or practice of discrimination. The crux of a Title VII inquiry is "the reason for a particular employment decision," *Cooper* v. *Federal Reserve Bank of Richmond*, 467 U. S. 867, 876, and respondents wish to sue for millions of employment decisions at once. Without some glue holding together the alleged reasons for those decisions, it will be impossible to say that examination of all the class members' claims will produce a common answer to the crucial discrimination question. Pp. 8–12.

(b) *General Telephone Co. of Southwest* v. *Falcon*, 457 U. S. 147, describes the proper approach to commonality. On the facts of this case, the conceptual gap between an individual's discrimination claim and "the existence of a class of persons who have suffered the same injury," *id.*, at 157–158, must be bridged by "[s]ignificant proof that an employer operated under a general policy of discrimination," *id.,* at 159, n. 15. Such proof is absent here. Wal-Mart's announced policy forbids sex discrimination, and the company has penalties for denials of equal opportunity. Respondents' only evidence of a general discrimination policy was a sociologist's analysis asserting that Wal-Mart's corporate culture made it vulnerable to gender bias. But because he could not estimate what percent of Wal-Mart employment decisions might be determined by stereotypical thinking, his testimony was worlds away from "significant proof" that Wal-Mart "operated under a general policy of discrimination." Pp. 12–14.

(c) The only corporate policy that the plaintiffs' evidence convincingly establishes is Wal-Mart's "policy" of giving local supervisors discretion over employment matters. While such a policy could be the basis of a Title VII disparate-impact claim, recognizing that a claim "can" exist does not mean that every employee in a company with that policy has a common claim. In a company of Wal-Mart's size and geographical scope, it is unlikely that all managers would exercise their discretion in a common way without some common direction. Respondents' attempt to show such direction by means of statistical and anecdotal evidence falls well short. Pp. 14–20.

2. Respondents' backpay claims were improperly certified under Rule 23(b)(2). Pp. 20–27.

(a) Claims for monetary relief may not be certified under Rule 23(b)(2), at least where the monetary relief is not incidental to the requested injunctive or declaratory relief. It is unnecessary to decide

whether monetary claims can ever be certified under the Rule because, at a minimum, claims for individualized relief, like backpay, are excluded. Rule 23(b)(2) applies only when a single, indivisible remedy would provide relief to each class member. The Rule's history and structure indicate that individualized monetary claims belong instead in Rule 23(b)(3), with its procedural protections of predominance, superiority, mandatory notice, and the right to opt out. Pp. 20–23.

   (b) Respondents nonetheless argue that their backpay claims were appropriately certified under Rule 23(b)(2) because those claims do not "predominate" over their injunctive and declaratory relief requests. That interpretation has no basis in the Rule's text and does obvious violence to the Rule's structural features. The mere "predominance" of a proper (b)(2) injunctive claim does nothing to justify eliminating Rule 23(b)(3)'s procedural protections, and creates incentives for class representatives to place at risk potentially valid monetary relief claims. Moreover, a district court would have to reevaluate the roster of class members continuously to excise those who leave their employment and become ineligible for classwide injunctive or declaratory relief. By contrast, in a properly certified (b)(3) class action for backpay, it would be irrelevant whether the plaintiffs are still employed at Wal-Mart. It follows that backpay claims should not be certified under Rule 23(b)(2). Pp. 23–26.

   (c) It is unnecessary to decide whether there are any forms of "incidental" monetary relief that are consistent with the above interpretation of Rule 23(b)(2) and the Due Process Clause because respondents' backpay claims are not incidental to their requested injunction. Wal-Mart is entitled to individualized determinations of each employee's eligibility for backpay. Once a plaintiff establishes a pattern or practice of discrimination, a district court must usually conduct "additional proceedings . . . to determine the scope of individual relief." *Teamsters* v. *United States*, 431 U. S. 324, 361. The company can then raise individual affirmative defenses and demonstrate that its action was lawful. *Id.*, at 362. The Ninth Circuit erred in trying to replace such proceedings with Trial by Formula. Because Rule 23 cannot be interpreted to "abridge, enlarge or modify any substantive right," 28 U. S. C. §2072(b), a class cannot be certified on the premise that Wal-Mart will not be entitled to litigate its statutory defenses to individual claims. Pp. 26–27.

603 F. 3d 571, reversed.

   SCALIA, J., delivered the opinion of the Court, in which ROBERTS, C. J., and KENNEDY, THOMAS, and ALITO, JJ., joined, and in which GINS-BURG, BREYER, SOTOMAYOR, and KAGAN, JJ., joined as to Parts I and III.

Syllabus

GINSBURG, J., filed an opinion concurring in part and dissenting in part, in which BREYER, SOTOMAYOR, and KAGAN, JJ., joined.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

No. 10–277

## WAL-MART STORES, INC., PETITIONER *v.* BETTY DUKES ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

[June 20, 2011]

JUSTICE SCALIA delivered the opinion of the Court.

We are presented with one of the most expansive class actions ever. The District Court and the Court of Appeals approved the certification of a class comprising about one and a half million plaintiffs, current and former female employees of petitioner Wal-Mart who allege that the discretion exercised by their local supervisors over pay and promotion matters violates Title VII by discriminating against women. In addition to injunctive and declaratory relief, the plaintiffs seek an award of backpay. We consider whether the certification of the plaintiff class was consistent with Federal Rules of Civil Procedure 23(a) and (b)(2).

## I
### A

Petitioner Wal-Mart is the Nation's largest private employer. It operates four types of retail stores throughout the country: Discount Stores, Supercenters, Neighborhood Markets, and Sam's Clubs. Those stores are divided into seven nationwide divisions, which in turn comprise 41 regions of 80 to 85 stores apiece. Each store has between

40 and 53 separate departments and 80 to 500 staff positions. In all, Wal-Mart operates approximately 3,400 stores and employs more than one million people.

Pay and promotion decisions at Wal-Mart are generally committed to local managers' broad discretion, which is exercised "in a largely subjective manner." 222 F. R. D. 137, 145 (ND Cal. 2004). Local store managers may increase the wages of hourly employees (within limits) with only limited corporate oversight. As for salaried employees, such as store managers and their deputies, higher corporate authorities have discretion to set their pay within preestablished ranges.

Promotions work in a similar fashion. Wal-Mart permits store managers to apply their own subjective criteria when selecting candidates as "support managers," which is the first step on the path to management. Admission to Wal-Mart's management training program, however, does require that a candidate meet certain objective criteria, including an above-average performance rating, at least one year's tenure in the applicant's current position, and a willingness to relocate. But except for those requirements, regional and district managers have discretion to use their own judgment when selecting candidates for management training. Promotion to higher office—*e.g.*, assistant manager, co-manager, or store manager—is similarly at the discretion of the employee's superiors after prescribed objective factors are satisfied.

B

The named plaintiffs in this lawsuit, representing the 1.5 million members of the certified class, are three current or former Wal-Mart employees who allege that the company discriminated against them on the basis of their sex by denying them equal pay or promotions, in violation of Title VII of the Civil Rights Act of 1964, 78 Stat. 253, as

amended, 42 U. S. C. §2000e–1 *et seq.*[1]

Betty Dukes began working at a Pittsburg, California, Wal-Mart in 1994. She started as a cashier, but later sought and received a promotion to customer service manager. After a series of disciplinary violations, however, Dukes was demoted back to cashier and then to greeter. Dukes concedes she violated company policy, but contends that the disciplinary actions were in fact retaliation for invoking internal complaint procedures and that male employees have not been disciplined for similar infractions. Dukes also claims two male greeters in the Pittsburg store are paid more than she is.

Christine Kwapnoski has worked at Sam's Club stores in Missouri and California for most of her adult life. She has held a number of positions, including a supervisory position. She claims that a male manager yelled at her frequently and screamed at female employees, but not at men. The manager in question "told her to 'doll up,' to wear some makeup, and to dress a little better." App. 1003a.

The final named plaintiff, Edith Arana, worked at a Wal-Mart store in Duarte, California, from 1995 to 2001. In 2000, she approached the store manager on more than one occasion about management training, but was brushed off. Arana concluded she was being denied opportunity for advancement because of her sex. She initiated internal complaint procedures, whereupon she was told to apply directly to the district manager if she thought her store manager was being unfair. Arana, however, decided against that and never applied for management training again. In 2001, she was fired for failure to comply with Wal-Mart's timekeeping policy.

These plaintiffs, respondents here, do not allege that

---

[1] The complaint included seven named plaintiffs, but only three remain part of the certified class as narrowed by the Court of Appeals.

Wal-Mart has any express corporate policy against the advancement of women. Rather, they claim that their local managers' discretion over pay and promotions is exercised disproportionately in favor of men, leading to an unlawful disparate impact on female employees, see 42 U. S. C. §2000e–2(k). And, respondents say, because Wal-Mart is aware of this effect, its refusal to cabin its managers' authority amounts to disparate treatment, see §2000e–2(a). Their complaint seeks injunctive and declaratory relief, punitive damages, and backpay. It does not ask for compensatory damages.

Importantly for our purposes, respondents claim that the discrimination to which they have been subjected is common to *all* Wal-Mart's female employees. The basic theory of their case is that a strong and uniform "corporate culture" permits bias against women to infect, perhaps subconsciously, the discretionary decisionmaking of each one of Wal-Mart's thousands of managers—thereby making every woman at the company the victim of one common discriminatory practice. Respondents therefore wish to litigate the Title VII claims of all female employees at Wal-Mart's stores in a nationwide class action.

## C

Class certification is governed by Federal Rule of Civil Procedure 23. Under Rule 23(a), the party seeking certification must demonstrate, first, that:

> "(1) the class is so numerous that joinder of all members is impracticable,
>
> "(2) there are questions of law or fact common to the class,
>
> "(3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and
>
> "(4) the representative parties will fairly and adequately protect the interests of the class" (paragraph

breaks added).

Second, the proposed class must satisfy at least one of the three requirements listed in Rule 23(b). Respondents rely on Rule 23(b)(2), which applies when "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole."[2]

Invoking these provisions, respondents moved the District Court to certify a plaintiff class consisting of "'[a]ll women employed at any Wal-Mart domestic retail store at any time since December 26, 1998, who have been or may be subjected to Wal-Mart's challenged pay and management track promotions policies and practices.'" 222 F. R. D., at 141–142 (quoting Plaintiff's Motion for Class Certification in case No. 3:01–cv–02252–CRB (ND Cal.), Doc. 99, p. 37). As evidence that there were indeed "questions of law or fact common to" all the women of Wal-Mart, as Rule 23(a)(2) requires, respondents relied chiefly on three forms of proof: statistical evidence about pay and promotion disparities between men and women at the company, anecdotal reports of discrimination from about 120 of Wal-Mart's female employees, and the testimony of a sociologist, Dr. William Bielby, who conducted a "social

––––––––––

[2] Rule 23(b)(1) allows a class to be maintained where "prosecuting separate actions by or against individual class members would create a risk of" either "(A) inconsistent or varying adjudications," or "(B) adjudications . . . that, as a practical matter, would be dispositive of the interests of the other members not parties to the individual adjudications or would substantially impair or impeded their ability to protect their interests." Rule 23(b)(3) states that a class may be maintained where "questions of law or fact common to class members predominate over any questions affecting only individual members," and a class action would be "superior to other available methods for fairly and efficiently adjudicating the controversy." The applicability of these provisions to the plaintiff class is not before us.

framework analysis" of Wal-Mart's "culture" and person-
nel practices, and concluded that the company was "vul-
nerable" to gender discrimination. 603 F. 3d 571, 601
(CA9 2010) (en banc).

Wal-Mart unsuccessfully moved to strike much of this
evidence. It also offered its own countervailing statistical
and other proof in an effort to defeat Rule 23(a)'s require-
ments of commonality, typicality, and adequate represen-
tation. Wal-Mart further contended that respondents'
monetary claims for backpay could not be certified under
Rule 23(b)(2), first because that Rule refers only to injunc-
tive and declaratory relief, and second because the back-
pay claims could not be manageably tried as a class with-
out depriving Wal-Mart of its right to present certain
statutory defenses. With one limitation not relevant here,
the District Court granted respondents' motion and certi-
fied their proposed class.[3]

## D

A divided en banc Court of Appeals substantially af-
firmed the District Court's certification order. 603 F. 3d
571. The majority concluded that respondents' evidence of
commonality was sufficient to "raise the common question
whether Wal-Mart's female employees nationwide were
subjected to a single set of corporate policies (not merely a
number of independent discriminatory acts) that may
have worked to unlawfully discriminate against them in
violation of Title VII." *Id.*, at 612 (emphasis deleted). It
also agreed with the District Court that the named plain-
tiffs' claims were sufficiently typical of the class as a whole

---

[3] The District Court excluded backpay claims based on promotion
opportunities that had not been publicly posted, for the reason that no
applicant data could exist for such positions. 222 F. R. D. 137, 182 (ND
Cal. 2004). It also decided to afford class members notice of the ac-
tion and the right to opt-out of the class with respect to respondents'
punitive-damages claim. *Id.*, at 173.

to satisfy Rule 23(a)(3), and that they could serve as adequate class representatives, see Rule 23(a)(4). *Id.*, at 614–615. With respect to the Rule 23(b)(2) question, the Ninth Circuit held that respondents' backpay claims could be certified as part of a (b)(2) class because they did not "predominat[e]" over the requests for declaratory and injunctive relief, meaning they were not "superior in strength, influence, or authority" to the nonmonetary claims. *Id.*, at 616 (internal quotation marks omitted).[4]

Finally, the Court of Appeals determined that the action could be manageably tried as a class action because the District Court could adopt the approach the Ninth Circuit approved in *Hilao* v. *Estate of Marcos*, 103 F. 3d 767, 782–787 (1996). There compensatory damages for some 9,541 class members were calculated by selecting 137 claims at random, referring those claims to a special master for valuation, and then extrapolating the validity and value of the untested claims from the sample set. See 603 F. 3d, at 625–626. The Court of Appeals "s[aw] no reason why a similar procedure to that used in *Hilao* could not be employed in this case." *Id.*, at 627. It would allow Wal-Mart "to present individual defenses in the randomly selected 'sample cases,' thus revealing the approximate percentage of class members whose unequal pay or nonpromotion was due to something other than gender discrimination." *Ibid.*, n. 56 (emphasis deleted).

———————

[4]To enable that result, the Court of Appeals trimmed the (b)(2) class in two ways: First, it remanded that part of the certification order which included respondents' punitive-damages claim in the (b)(2) class, so that the District Court might consider whether that might cause the monetary relief to predominate. 603 F. 3d, at 621. Second, it accepted in part Wal-Mart's argument that since class members whom it no longer employed had no standing to seek injunctive or declaratory relief, as to them monetary claims must predominate. It excluded from the certified class "those putative class members who were no longer Wal-Mart employees *at the time Plaintiffs' complaint was filed*," *id.*, at 623 (emphasis added).

We granted certiorari. 562 U. S. ___ (2010).

## II

The class action is "an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only." *Califano* v. *Yamasaki*, 442 U. S. 682, 700–701 (1979). In order to justify a departure from that rule, "a class representative must be part of the class and 'possess the same interest and suffer the same injury' as the class members." *East Tex. Motor Freight System, Inc.* v. *Rodriguez*, 431 U. S. 395, 403 (1977) (quoting *Schlesinger* v. *Reservists Comm. to Stop the War*, 418 U. S. 208, 216 (1974)). Rule 23(a) ensures that the named plaintiffs are appropriate representatives of the class whose claims they wish to litigate. The Rule's four requirements—numerosity, commonality, typicality, and adequate representation—"effectively 'limit the class claims to those fairly encompassed by the named plaintiff's claims.'" *General Telephone Co. of Southwest* v. *Falcon*, 457 U. S. 147, 156 (1982) (quoting *General Telephone Co. of Northwest* v. *EEOC*, 446 U. S. 318, 330 (1980)).

## A

The crux of this case is commonality—the rule requiring a plaintiff to show that "there are questions of law or fact common to the class." Rule 23(a)(2).[5] That language is

---

[5] We have previously stated in this context that "[t]he commonality and typicality requirements of Rule 23(a) tend to merge. Both serve as guideposts for determining whether under the particular circumstances maintenance of a class action is economical and whether the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence. Those requirements therefore also tend to merge with the adequacy-of-representation requirement, although the latter requirement also raises concerns about the competency of class counsel and conflicts of interest." *General Telephone Co. of Southwest* v. *Fal-*

easy to misread, since "[a]ny competently crafted class complaint literally raises common 'questions.'" Nagareda, Class Certification in the Age of Aggregate Proof, 84 N. Y. U. L. Rev. 97, 131–132 (2009). For example: Do all of us plaintiffs indeed work for Wal-Mart? Do our managers have discretion over pay? Is that an unlawful employment practice? What remedies should we get? Reciting these questions is not sufficient to obtain class certification. Commonality requires the plaintiff to demonstrate that the class members "have suffered the same injury," *Falcon*, *supra*, at 157. This does not mean merely that they have all suffered a violation of the same provision of law. Title VII, for example, can be violated in many ways—by intentional discrimination, or by hiring and promotion criteria that result in disparate impact, and by the use of these practices on the part of many different superiors in a single company. Quite obviously, the mere claim by employees of the same company that they have suffered a Title VII injury, or even a disparate-impact Title VII injury, gives no cause to believe that all their claims can productively be litigated at once. Their claims must depend upon a common contention—for example, the assertion of discriminatory bias on the part of the same supervisor. That common contention, moreover, must be of such a nature that it is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke.

> "What matters to class certification . . . is not the raising of common 'questions'—even in droves—but, rather the capacity of a classwide proceeding to gen-

_____

con, 457 U. S. 147, 157–158, n. 13 (1982). In light of our disposition of the commonality question, however, it is unnecessary to resolve whether respondents have satisfied the typicality and adequate-representation requirements of Rule 23(a).

erate common *answers* apt to drive the resolution of
the litigation. Dissimilarities within the proposed
class are what have the potential to impede the gen-
eration of common answers." Nagareda, *supra*, at 132.

Rule 23 does not set forth a mere pleading standard. A
party seeking class certification must affirmatively dem-
onstrate his compliance with the Rule—that is, he must be
prepared to prove that there are *in fact* sufficiently nu-
merous parties, common questions of law or fact, etc. We
recognized in *Falcon* that "sometimes it may be necessary
for the court to probe behind the pleadings before coming
to rest on the certification question," 457 U. S., at 160, and
that certification is proper only if "the trial court is satis-
fied, after a rigorous analysis, that the prerequisites of
Rule 23(a) have been satisfied," *id.*, at 161; see *id.*, at 160
("[A]ctual, not presumed, conformance with Rule 23(a)
remains . . . indispensable"). Frequently that "rigorous
analysis" will entail some overlap with the merits of
the plaintiff's underlying claim. That cannot be helped.
"'[T]he class determination generally involves considera-
tions that are enmeshed in the factual and legal issues
comprising the plaintiff's cause of action.'" *Falcon*, *supra*,
at 160 (quoting *Coopers & Lybrand* v. *Livesay*, 437 U. S.
463, 469 (1978); some internal quotation marks omitted).[6]

---

[6] A statement in one of our prior cases, *Eisen* v. *Carlisle & Jacquelin*,
417 U. S. 156, 177 (1974), is sometimes mistakenly cited to the con-
trary: "We find nothing in either the language or history of Rule 23 that
gives a court any authority to conduct a preliminary inquiry into the
merits of a suit in order to determine whether it may be maintained as
a class action." But in that case, the judge had conducted a preliminary
inquiry into the merits of a suit, not in order to determine the propriety
of certification under Rules 23(a) and (b) (he had already done that, see
*id.*, at 165), but in order to shift the cost of notice required by Rule
23(c)(2) from the plaintiff to the defendants. To the extent the quoted
statement goes beyond the permissibility of a merits inquiry for any
other pretrial purpose, it is the purest dictum and is contradicted by
our other cases.

Opinion of the Court

Nor is there anything unusual about that consequence: The necessity of touching aspects of the merits in order to resolve preliminary matters, *e.g.*, jurisdiction and venue, is a familiar feature of litigation. See *Szabo* v. *Bridgeport Machines, Inc.*, 249 F. 3d 672, 676–677 (CA7 2001) (Easterbrook, J.).

In this case, proof of commonality necessarily overlaps with respondents' merits contention that Wal-Mart engages in a *pattern or practice* of discrimination.[7] That is so because, in resolving an individual's Title VII claim, the crux of the inquiry is "the reason for a particular employment decision," *Cooper* v. *Federal Reserve Bank of Richmond*, 467 U. S. 867, 876 (1984). Here respondents wish

———————

Perhaps the most common example of considering a merits question at the Rule 23 stage arises in class-action suits for securities fraud. Rule 23(b)(3)'s requirement that "questions of law or fact common to class members predominate over any questions affecting only individual members" would often be an insuperable barrier to class certification, since each of the individual investors would have to prove reliance on the alleged misrepresentation. But the problem dissipates if the plaintiffs can establish the applicability of the so-called "fraud on the market" presumption, which says that all traders who purchase stock in an efficient market are presumed to have relied on the accuracy of a company's public statements. To invoke this presumption, the plaintiffs seeking 23(b)(3) certification must prove that their shares were traded on an efficient market, *Erica P. John Fund, Inc.* v. *Halliburton Co.*, 563 U. S. \_\_\_, \_\_\_ (2011) (slip op., at 5), an issue they will surely have to prove *again* at trial in order to make out their case on the merits.

[7] In a pattern-or-practice case, the plaintiff tries to "establish by a preponderance of the evidence that . . . discrimination was the company's standard operating procedure[,] the regular rather than the unusual practice." *Teamsters* v. *United States*, 431 U. S. 324, 358 (1977); see also *Franks* v. *Bowman Transp. Co.*, 424 U. S. 747, 772 (1976). If he succeeds, that showing will support a rebuttable inference that all class members were victims of the discriminatory practice, and will justify "an award of prospective relief," such as "an injunctive order against the continuation of the discriminatory practice." *Teamsters*, *supra*, at 361.

to sue about literally millions of employment decisions at once. Without some glue holding the alleged *reasons* for all those decisions together, it will be impossible to say that examination of all the class members' claims for relief will produce a common answer to the crucial question *why was I disfavored*.

B

This Court's opinion in *Falcon* describes how the commonality issue must be approached. There an employee who claimed that he was deliberately denied a promotion on account of race obtained certification of a class comprising all employees wrongfully denied promotions and all applicants wrongfully denied jobs. 457 U. S., at 152. We rejected that composite class for lack of commonality and typicality, explaining:

"Conceptually, there is a wide gap between (a) an individual's claim that he has been denied a promotion [or higher pay] on discriminatory grounds, and his otherwise unsupported allegation that the company has a policy of discrimination, and (b) the existence of a class of persons who have suffered the same injury as that individual, such that the individual's claim and the class claim will share common questions of law or fact and that the individual's claim will be typical of the class claims." *Id.*, at 157–158.

*Falcon* suggested two ways in which that conceptual gap might be bridged. First, if the employer "used a biased testing procedure to evaluate both applicants for employment and incumbent employees, a class action on behalf of every applicant or employee who might have been prejudiced by the test clearly would satisfy the commonality and typicality requirements of Rule 23(a)." *Id.,* at 159, n. 15. Second, "[s]ignificant proof that an employer operated under a general policy of discrimination conceivably

could justify a class of both applicants and employees if the discrimination manifested itself in hiring and promotion practices in the same general fashion, such as through entirely subjective decisionmaking processes." *Ibid.* We think that statement precisely describes respondents' burden in this case. The first manner of bridging the gap obviously has no application here; Wal-Mart has no testing procedure or other companywide evaluation method that can be charged with bias. The whole point of permitting discretionary decisionmaking is to avoid evaluating employees under a common standard.

The second manner of bridging the gap requires "significant proof" that Wal-Mart "operated under a general policy of discrimination." That is entirely absent here. Wal-Mart's announced policy forbids sex discrimination, see App. 1567a–1596a, and as the District Court recognized the company imposes penalties for denials of equal employment opportunity, 222 F. R. D., at 154. The only evidence of a "general policy of discrimination" respondents produced was the testimony of Dr. William Bielby, their sociological expert. Relying on "social framework" analysis, Bielby testified that Wal-Mart has a "strong corporate culture," that makes it "'vulnerable'" to "gender bias." *Id.,* at 152. He could not, however, "determine with any specificity how regularly stereotypes play a meaningful role in employment decisions at Wal-Mart. At his deposition . . . Dr. Bielby conceded that he could not calculate whether 0.5 percent or 95 percent of the employment decisions at Wal-Mart might be determined by stereotyped thinking." 222 F. R. D. 189, 192 (ND Cal. 2004). The parties dispute whether Bielby's testimony even met the standards for the admission of expert testimony under Federal Rule of Civil Procedure 702 and our *Daubert* case, see *Daubert* v. *Merrell Dow Pharmaceuticals, Inc.*, 509

U. S. 579 (1993).[8]   The District Court concluded that *Daubert* did not apply to expert testimony at the certification stage of class-action proceedings. 222 F. R. D., at 191. We doubt that is so, but even if properly considered, Bielby's testimony does nothing to advance respondents' case. "[W]hether 0.5 percent or 95 percent of the employment decisions at Wal-Mart might be determined by stereotyped thinking" is the essential question on which respondents' theory of commonality depends. If Bielby admittedly has no answer to that question, we can safely disregard what he has to say. It is worlds away from "significant proof" that Wal-Mart "operated under a general policy of discrimination."

### C

The only corporate policy that the plaintiffs' evidence convincingly establishes is Wal-Mart's "policy" of *allowing discretion* by local supervisors over employment matters. On its face, of course, that is just the opposite of a uniform employment practice that would provide the commonality needed for a class action; it is a policy *against having* uniform employment practices. It is also a very common

---

[8] Bielby's conclusions in this case have elicited criticism from the very scholars on whose conclusions he relies for his social-framework analysis. See Monahan, Walker, & Mitchell, Contextual Evidence of Gender Discrimination: The Ascendance of "Social Frameworks," 94 Va. L. Rev. 1715, 1747 (2008) ("[Bielby's] research into conditions and behavior at Wal-Mart did not meet the standards expected of social scientific research into stereotyping and discrimination"); *id.*, at 1745, 1747 ("[A] social framework necessarily contains only general statements about reliable patterns of relations among variables . . . and goes no further. . . . Dr. Bielby claimed to present a social framework, but he testified about social facts specific to Wal-Mart"); *id.*, at 1747–1748 ("Dr. Bielby's report provides no verifiable method for measuring and testing any of the variables that were crucial to his conclusions and reflects nothing more than Dr. Bielby's 'expert judgment' about how general stereotyping research applied to all managers across all of Wal-Mart's stores nationwide for the multi-year class period").

and presumptively reasonable way of doing business—one that we have said "should itself raise no inference of discriminatory conduct," *Watson* v. *Fort Worth Bank & Trust*, 487 U. S. 977, 990 (1988).

To be sure, we have recognized that, "in appropriate cases," giving discretion to lower-level supervisors can be the basis of Title VII liability under a disparate-impact theory—since "an employer's undisciplined system of subjective decisionmaking [can have] precisely the same effects as a system pervaded by impermissible intentional discrimination." *Id.*, at 990–991. But the recognition that this type of Title VII claim "can" exist does not lead to the conclusion that every employee in a company using a system of discretion has such a claim in common. To the contrary, left to their own devices most managers in any corporation—and surely most managers in a corporation that forbids sex discrimination—would select sex-neutral, performance-based criteria for hiring and promotion that produce no actionable disparity at all. Others may choose to reward various attributes that produce disparate impact—such as scores on general aptitude tests or educational achievements, see *Griggs* v. *Duke Power Co.*, 401 U. S. 424, 431–432 (1971). And still other managers may be guilty of intentional discrimination that produces a sex-based disparity. In such a company, demonstrating the invalidity of one manager's use of discretion will do nothing to demonstrate the invalidity of another's. A party seeking to certify a nationwide class will be unable to show that all the employees' Title VII claims will in fact depend on the answers to common questions.

Respondents have not identified a common mode of exercising discretion that pervades the entire company—aside from their reliance on Dr. Bielby's social frameworks analysis that we have rejected. In a company of Wal-Mart's size and geographical scope, it is quite unbelievable that all managers would exercise their discretion in a common way

without some common direction. Respondents attempt to make that showing by means of statistical and anecdotal evidence, but their evidence falls well short.

The statistical evidence consists primarily of regression analyses performed by Dr. Richard Drogin, a statistician, and Dr. Marc Bendick, a labor economist. Drogin conducted his analysis region-by-region, comparing the number of women promoted into management positions with the percentage of women in the available pool of hourly workers. After considering regional and national data, Drogin concluded that "there are statistically significant disparities between men and women at Wal-Mart . . . [and] these disparities . . . can be explained only by gender discrimination." 603 F. 3d, at 604 (internal quotation marks omitted). Bendick compared work-force data from Wal-Mart and competitive retailers and concluded that Wal-Mart "promotes a lower percentage of women than its competitors." *Ibid.*

Even if they are taken at face value, these studies are insufficient to establish that respondents' theory can be proved on a classwide basis. In *Falcon*, we held that one named plaintiff's experience of discrimination was insufficient to infer that "discriminatory treatment is typical of [the employer's employment] practices." 457 U. S., at 158. A similar failure of inference arises here. As Judge Ikuta observed in her dissent, "[i]nformation about disparities at the regional and national level does not establish the existence of disparities at individual stores, let alone raise the inference that a company-wide policy of discrimination is implemented by discretionary decisions at the store and district level." 603 F. 3d, at 637. A regional pay disparity, for example, may be attributable to only a small set of Wal-Mart stores, and cannot by itself establish the uniform, store-by-store disparity upon which the plaintiffs' theory of commonality depends.

There is another, more fundamental, respect in which

respondents' statistical proof fails. Even if it established (as it does not) a pay or promotion pattern that differs from the nationwide figures or the regional figures in *all* of Wal-Mart's 3,400 stores, that would still not demonstrate that commonality of issue exists. Some managers will claim that the availability of women, or qualified women, or interested women, in their stores' area does not mirror the national or regional statistics. And almost all of them will claim to have been applying some sex-neutral, performance-based criteria—whose nature and effects will differ from store to store. In the landmark case of ours which held that giving discretion to lower-level supervisors can be the basis of Title VII liability under a disparate-impact theory, the plurality opinion *conditioned* that holding on the corollary that merely proving that the discretionary system has produced a racial or sexual disparity *is not enough*. "[T]he plaintiff must begin by identifying the specific employment practice that is challenged." *Watson*, 487 U. S., at 994; accord, *Wards Cove Packing Co.* v. *Atonio*, 490 U. S. 642, 656 (1989) (approving that statement), superseded by statute on other grounds, 42 U. S. C. §2000e–2(k). That is all the more necessary when a class of plaintiffs is sought to be certified. Other than the bare existence of delegated discretion, respondents have identified no "specific employment practice"—much less one that ties all their 1.5 million claims together. Merely showing that Wal-Mart's policy of discretion has produced an overall sex-based disparity does not suffice.

Respondents' anecdotal evidence suffers from the same defects, and in addition is too weak to raise any inference that all the individual, discretionary personnel decisions are discriminatory. In *Teamsters* v. *United States*, 431 U. S. 324 (1977), in addition to substantial statistical evidence of company-wide discrimination, the Government (as plaintiff) produced about 40 specific accounts of racial

discrimination from particular individuals. See *id.*, at 338. That number was significant because the company involved had only 6,472 employees, of whom 571 were minorities, *id.*, at 337, and the class itself consisted of around 334 persons, *United States* v. *T.I.M.E.-D. C., Inc.*, 517 F. 2d 299, 308 (CA5 1975), overruled on other grounds*, Teamsters*, *supra.* The 40 anecdotes thus represented roughly one account for every eight members of the class. Moreover, the Court of Appeals noted that the anecdotes came from individuals "spread throughout" the company who "for the most part" worked at the company's operational centers that employed the largest numbers of the class members. 517 F. 2d, at 315, and n. 30. Here, by contrast, respondents filed some 120 affidavits reporting experiences of discrimination—about 1 for every 12,500 class members—relating to only some 235 out of Wal-Mart's 3,400 stores. 603 F. 3d, at 634 (Ikuta, J., dissenting). More than half of these reports are concentrated in only six States (Alabama, California, Florida, Missouri, Texas, and Wisconsin); half of all States have only one or two anecdotes; and 14 States have no anecdotes about Wal-Mart's operations at all. *Id.*, at 634–635, and n. 10. Even if every single one of these accounts is true, that would not demonstrate that the entire company "operate[s] under a general policy of discrimination," *Falcon*, *supra*, at 159, n. 15, which is what respondents must show to certify a companywide class.[9]

The dissent misunderstands the nature of the foregoing

––––––––––

[9] The dissent says that we have adopted "a rule that a discrimination claim, if accompanied by anecdotes, must supply them in numbers proportionate to the size of the class." *Post*, at 5, n. 4 (GINSBURG, J., concurring in part and dissenting in part). That is not quite accurate. A discrimination claimant is free to supply as few anecdotes as he wishes. But when the claim is that a company operates under a general policy of discrimination, a few anecdotes selected from literally millions of employment decisions prove nothing at all.

analysis. It criticizes our focus on the dissimilarities be-
tween the putative class members on the ground that
we have "blend[ed]" Rule 23(a)(2)'s commonality require-
ment with Rule 23(b)(3)'s inquiry into whether common
questions "predominate" over individual ones. See *post*, at
8–10 (GINSBURG, J., concurring in part and dissenting in
part). That is not so. We quite agree that for purposes of
Rule 23(a)(2) "'[e]ven a single [common] question'" will do,
*post*, at 10, n. 9 (quoting Nagareda, The Preexistence
Principle and the Structure of the Class Action, 103
Colum. L. Rev. 149, 176, n. 110 (2003)). We consider
dissimilarities not in order to determine (as Rule 23(b)(3)
requires) whether common questions *predominate*, but in
order to determine (as Rule 23(a)(2) requires) whether
there *is* "[e]ven a single [common] question." And there is
not here. Because respondents provide no convincing
proof of a companywide discriminatory pay and promotion
policy, we have concluded that they have not established
the existence of any common question.[10]

In sum, we agree with Chief Judge Kozinski that the
members of the class:

> "held a multitude of different jobs, at different levels
> of Wal-Mart's hierarchy, for variable lengths of time,
> in 3,400 stores, sprinkled across 50 states, with a ka-
> leidoscope of supervisors (male and female), subject to
> a variety of regional policies that all differed. . . .
> Some thrived while others did poorly. They have little
> in common but their sex and this lawsuit." 603 F. 3d,

---

[10] For this reason, there is no force to the dissent's attempt to distin-
guish *Falcon* on the ground that in that case there were "'*no* common
questions of law or fact' between the claims of the lead plaintiff and the
applicant class" *post*, at 9, n. 7 (quoting *Falcon*, 457 U. S., at 162
(Burger, C. J., concurring in part and dissenting in part)). Here also
there is nothing to unite all of the plaintiffs' claims, since (contrary to
the dissent's contention, *post*, at 9, n. 7), the same employment prac-
tices do not "touch and concern all members of the class."

at 652 (dissenting opinion).

### III

We also conclude that respondents' claims for backpay were improperly certified under Federal Rule of Civil Procedure 23(b)(2). Our opinion in *Ticor Title Ins. Co.* v. *Brown*, 511 U. S. 117, 121 (1994) *(per curiam)* expressed serious doubt about whether claims for monetary relief may be certified under that provision. We now hold that they may not, at least where (as here) the monetary relief is not incidental to the injunctive or declaratory relief.

### A

Rule 23(b)(2) allows class treatment when "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." One possible reading of this provision is that it applies *only* to requests for such injunctive or declaratory relief and does not authorize the class certification of monetary claims at all. We need not reach that broader question in this case, because we think that, at a minimum, claims for *individualized* relief (like the backpay at issue here) do not satisfy the Rule. The key to the (b)(2) class is "the indivisible nature of the injunctive or declaratory remedy warranted—the notion that the conduct is such that it can be enjoined or declared unlawful only as to all of the class members or as to none of them." Nagareda, 84 N. Y. U. L. Rev., at 132. In other words, Rule 23(b)(2) applies only when a single injunction or declaratory judgment would provide relief to each member of the class. It does not authorize class certification when each individual class member would be entitled to a *different* injunction or declaratory judgment against the defendant. Similarly, it does not authorize class certification when each class member would be entitled to an

individualized award of monetary damages.

That interpretation accords with the history of the Rule. Because Rule 23 "stems from equity practice" that pre-dated its codification, *Amchem Products, Inc.* v. *Windsor*, 521 U. S. 591, 613 (1997), in determining its meaning we have previously looked to the historical models on which the Rule was based, *Ortiz* v. *Fibreboard Corp.*, 527 U. S. 815, 841–845 (1999). As we observed in *Amchem*, "[c]ivil rights cases against parties charged with unlawful, class-based discrimination are prime examples" of what (b)(2) is meant to capture. 521 U. S., at 614. In particular, the Rule reflects a series of decisions involving challenges to racial segregation—conduct that was remedied by a single classwide order. In none of the cases cited by the Advisory Committee as examples of (b)(2)'s antecedents did the plaintiffs combine any claim for individualized relief with their classwide injunction. See Advisory Committee's Note, 39 F. R. D. 69, 102 (1966) (citing cases); *e.g.*, *Potts* v. *Flax*, 313 F. 2d 284, 289, n. 5 (CA5 1963); *Brunson* v. *Board of Trustees of Univ. of School Dist. No. 1, Clarendon Cty.,* 311 F. 2d 107, 109 (CA4 1962) *(per curiam); Frasier* v. *Board of Trustees of N.C.*, 134 F. Supp. 589, 593 (NC 1955) (three-judge court), aff'd, 350 U. S. 979 (1956).

Permitting the combination of individualized and class-wide relief in a (b)(2) class is also inconsistent with the structure of Rule 23(b). Classes certified under (b)(1) and (b)(2) share the most traditional justifications for class treatment—that individual adjudications would be impos-sible or unworkable, as in a (b)(1) class,[11] or that the relief

―――――――

[11] Rule 23(b)(1) applies where separate actions by or against individ-ual class members would create a risk of "establish[ing] incompatible standards of conduct for the party opposing the class," Rule 23(b)(1)(A), such as "where the party is obliged by law to treat the members of the class alike," *Amchem Products, Inc.* v. *Windsor*, 521 U. S. 591, 614 (1997), or where individual adjudications "as a practical matter, would be dispositive of the interests of the other members not parties to the

sought must perforce affect the entire class at once, as in a (b)(2) class. For that reason these are also mandatory classes: The Rule provides no opportunity for (b)(1) or (b)(2) class members to opt out, and does not even oblige the District Court to afford them notice of the action. Rule 23(b)(3), by contrast, is an "adventuresome innovation" of the 1966 amendments, *Amchem*, 521 U. S., at 614 (internal quotation marks omitted), framed for situations "in which 'class-action treatment is not as clearly called for'," *id.*, at 615 (quoting Advisory Committee's Notes, 28 U. S. C. App., p. 697 (1994 ed.)). It allows class certification in a much wider set of circumstances but with greater procedural protections. Its only prerequisites are that "the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Rule 23(b)(3). And unlike (b)(1) and (b)(2) classes, the (b)(3) class is not mandatory; class members are entitled to receive "the best notice that is practicable under the circumstances" and to withdraw from the class at their option. See Rule 23(c)(2)(B).

Given that structure, we think it clear that individualized monetary claims belong in Rule 23(b)(3). The procedural protections attending the (b)(3) class— predominance, superiority, mandatory notice, and the right to opt out—are missing from (b)(2) not because the Rule considers them unnecessary, but because it considers them unnecessary *to a (b)(2) class.* When a class seeks an indivisible injunction benefitting all its members at once, there is no reason to undertake a case-specific inquiry into

_____

individual adjudications or would substantially impair or impede their ability to protect their interests," Rule 23(b)(1)(B), such as in "'limited fund' cases, . . . in which numerous persons make claims against a fund insufficient to satisfy all claims," *Amchem, supra*, at 614.

whether class issues predominate or whether class action is a superior method of adjudicating the dispute. Predominance and superiority are self-evident. But with respect to each class member's individualized claim for money, that is not so—which is precisely why (b)(3) requires the judge to make findings about predominance and superiority before allowing the class. Similarly, (b)(2) does not require that class members be given notice and opt-out rights, presumably because it is thought (rightly or wrongly) that notice has no purpose when the class is mandatory, and that depriving people of their right to sue in this manner complies with the Due Process Clause. In the context of a class action predominantly for money damages we have held that absence of notice and opt-out violates due process. See *Phillips Petroleum Co.* v. *Shutts*, 472 U. S. 797, 812 (1985). While we have never held that to be so where the monetary claims do not predominate, the serious possibility that it may be so provides an additional reason not to read Rule 23(b)(2) to include the monetary claims here.

B

Against that conclusion, respondents argue that their claims for backpay were appropriately certified as part of a class under Rule 23(b)(2) because those claims do not "predominate" over their requests for injunctive and declaratory relief. They rely upon the Advisory Committee's statement that Rule 23(b)(2) "does not extend to cases in which the appropriate final relief relates *exclusively or predominantly* to money damages." 39 F. R. D., at 102 (emphasis added). The negative implication, they argue, is that it *does* extend to cases in which the appropriate final relief relates only partially and nonpredominantly to money damages. Of course it is the Rule itself, not the Advisory Committee's description of it, that governs. And a mere negative inference does not in our view suffice to

establish a disposition that has no basis in the Rule's text, and that does obvious violence to the Rule's structural features. The mere "predominance" of a proper (b)(2) injunctive claim does nothing to justify elimination of Rule 23(b)(3)'s procedural protections: It neither establishes the superiority of *class* adjudication over *individual* adjudication nor cures the notice and opt-out problems. We fail to see why the Rule should be read to nullify these protections whenever a plaintiff class, at its option, combines its monetary claims with a request—even a "predominating request"—for an injunction.

Respondents' predominance test, moreover, creates perverse incentives for class representatives to place at risk potentially valid claims for monetary relief. In this case, for example, the named plaintiffs declined to include employees' claims for compensatory damages in their complaint. That strategy of including only backpay claims made it more likely that monetary relief would not "predominate." But it also created the possibility (if the predominance test were correct) that individual class members' compensatory-damages claims would be *precluded* by litigation they had no power to hold themselves apart from. If it were determined, for example, that a particular class member is not entitled to backpay because her denial of increased pay or a promotion was *not* the product of discrimination, that employee might be collaterally estopped from independently seeking compensatory damages based on that same denial. That possibility underscores the need for plaintiffs with individual monetary claims to decide *for themselves* whether to tie their fates to the class representatives' or go it alone—a choice Rule 23(b)(2) does not ensure that they have.

The predominance test would also require the District Court to reevaluate the roster of class members continually. The Ninth Circuit recognized the necessity for this when it concluded that those plaintiffs no longer employed

by Wal-Mart lack standing to seek injunctive or declaratory relief against its employment practices. The Court of Appeals' response to that difficulty, however, was not to eliminate *all* former employees from the certified class, but to eliminate only those who had left the company's employ by the date the complaint was filed. That solution has no logical connection to the problem, since those who have left their Wal-Mart jobs *since* the complaint was filed have no more need for prospective relief than those who left beforehand. As a consequence, even though the validity of a (b)(2) class depends on whether "final injunctive relief or corresponding declaratory relief is appropriate respecting the class *as a whole*," Rule 23(b)(2) (emphasis added), about half the members of the class approved by the Ninth Circuit have no claim for injunctive or declaratory relief at all. Of course, the alternative (and logical) solution of excising plaintiffs from the class as they leave their employment may have struck the Court of Appeals as wasteful of the District Court's time. Which indeed it is, since if a backpay action were properly certified for class treatment under *(b)(3)*, the ability to litigate a plaintiff's backpay claim as part of the class would not turn on the irrelevant question whether she is still employed at Wal-Mart. What follows from this, however, is not that some arbitrary limitation on class membership should be imposed but that the backpay claims should not be certified under Rule 23(b)(2) at all.

Finally, respondents argue that their backpay claims are appropriate for a (b)(2) class action because a backpay award is equitable in nature. The latter may be true, but it is irrelevant. The Rule does not speak of "equitable" remedies generally but of injunctions and declaratory judgments. As Title VII itself makes pellucidly clear, backpay is neither. See 42 U. S. C. §2000e–5(g)(2)(B)(i) and (ii) (distinguishing between declaratory and injunctive relief and the payment of "backpay," see §2000e–

5(g)(2)(A)).

## C

In *Allison* v. *Citgo Petroleum Corp.*, 151 F. 3d 402, 415 (CA5 1998), the Fifth Circuit held that a (b)(2) class would permit the certification of monetary relief that is "incidental to requested injunctive or declaratory relief," which it defined as "damages that flow directly from liability to the class *as a whole* on the claims forming the basis of the injunctive or declaratory relief." In that court's view, such "incidental damage should not require additional hearings to resolve the disparate merits of each individual's case; it should neither introduce new substantial legal or factual issues, nor entail complex individualized determinations." *Ibid.* We need not decide in this case whether there are any forms of "incidental" monetary relief that are consistent with the interpretation of Rule 23(b)(2) we have announced and that comply with the Due Process Clause. Respondents do not argue that they can satisfy this standard, and in any event they cannot.

Contrary to the Ninth Circuit's view, Wal-Mart is entitled to individualized determinations of each employee's eligibility for backpay. Title VII includes a detailed remedial scheme. If a plaintiff prevails in showing that an employer has discriminated against him in violation of the statute, the court "may enjoin the respondent from engaging in such unlawful employment practice, and order such affirmative action as may be appropriate, [including] reinstatement or hiring of employees, with or without backpay . . . or any other equitable relief as the court deems appropriate." §2000e–5(g)(1). But if the employer can show that it took an adverse employment action against an employee for any reason other than discrimination, the court cannot order the "hiring, reinstatement, or promotion of an individual as an employee, or the payment to him of any backpay." §2000e–5(g)(2)(A).

We have established a procedure for trying pattern-or-practice cases that gives effect to these statutory requirements. When the plaintiff seeks individual relief such as reinstatement or backpay after establishing a pattern or practice of discrimination, "a district court must usually conduct additional proceedings . . . to determine the scope of individual relief." *Teamsters*, 431 U. S., at 361. At this phase, the burden of proof will shift to the company, but it will have the right to raise any individual affirmative defenses it may have, and to "demonstrate that the individual applicant was denied an employment opportunity for lawful reasons." *Id.*, at 362.

The Court of Appeals believed that it was possible to replace such proceedings with Trial by Formula. A sample set of the class members would be selected, as to whom liability for sex discrimination and the backpay owing as a result would be determined in depositions supervised by a master. The percentage of claims determined to be valid would then be applied to the entire remaining class, and the number of (presumptively) valid claims thus derived would be multiplied by the average backpay award in the sample set to arrive at the entire class recovery—without further individualized proceedings. 603 F. 3d, at 625–627. We disapprove that novel project. Because the Rules Enabling Act forbids interpreting Rule 23 to "abridge, enlarge or modify any substantive right," 28 U. S. C. §2072(b); see *Ortiz*, 527 U. S., at 845, a class cannot be certified on the premise that Wal-Mart will not be entitled to litigate its statutory defenses to individual claims. And because the necessity of that litigation will prevent backpay from being "incidental" to the classwide injunction, respondents' class could not be certified even assuming, *arguendo*, that "incidental" monetary relief can be awarded to a 23(b)(2) class.

*　　*　　*

The judgment of the Court of Appeals is

*Reversed.*

# SUPREME COURT OF THE UNITED STATES

No. 10–277

WAL-MART STORES, INC., PETITIONER *v.*
BETTY DUKES ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE NINTH CIRCUIT

[June 20, 2011]

JUSTICE GINSBURG, with whom JUSTICE BREYER, JUSTICE SOTOMAYOR, and JUSTICE KAGAN join, concurring in part and dissenting in part.

The class in this case, I agree with the Court, should not have been certified under Federal Rule of Civil Procedure 23(b)(2). The plaintiffs, alleging discrimination in violation of Title VII, 42 U. S. C. §2000e *et seq.*, seek monetary relief that is not merely incidental to any injunctive or declaratory relief that might be available. See *ante*, at 20–27. A putative class of this type may be certifiable under Rule 23(b)(3), if the plaintiffs show that common class questions "predominate" over issues affecting individuals— *e.g.*, qualification for, and the amount of, backpay or compensatory damages—and that a class action is "superior" to other modes of adjudication.

Whether the class the plaintiffs describe meets the specific requirements of Rule 23(b)(3) is not before the Court, and I would reserve that matter for consideration and decision on remand.[1] The Court, however, disqualifies the class at the starting gate, holding that the plaintiffs cannot cross the "commonality" line set by Rule 23(a)(2).

---

[1] The plaintiffs requested Rule 23(b)(3) certification as an alternative, should their request for (b)(2) certification fail. Plaintiffs' Motion for Class Certification in No. 3:01–cv–02252–CRB (ND Cal.), Doc. 99, p. 47.

In so ruling, the Court imports into the Rule 23(a) determination concerns properly addressed in a Rule 23(b)(3) assessment.

## I

### A

Rule 23(a)(2) establishes a preliminary requirement for maintaining a class action: "[T]here are questions of law or fact common to the class."[2]  The Rule "does not require that all questions of law or fact raised in the litigation be common," 1 H. Newberg & A. Conte, Newberg on Class Actions §3.10, pp. 3–48 to 3–49 (3d ed. 1992); indeed, "[e]ven a single question of law or fact common to the members of the class will satisfy the commonality requirement," Nagareda, The Preexistence Principle and the Structure of the Class Action, 103 Colum. L. Rev. 149, 176, n. 110 (2003).  See Advisory Committee's 1937 Notes on Fed. Rule Civ. Proc. 23, 28 U. S. C. App., p. 138 (citing with approval cases in which "there was only a question of law or fact common to" the class members).

A "question" is ordinarily understood to be "[a] subject or point open to controversy."  American Heritage Dictionary 1483 (3d ed. 1992).  See also Black's Law Dictionary 1366 (9th ed. 2009) (defining "question of fact" as "[a] disputed issue to be resolved . . . [at] trial" and "question of law" as "[a]n issue to be decided by the judge").  Thus, a "question" "common to the class" must be a dispute, either

_____

[2] Rule 23(a) lists three other threshold requirements for class-action certification: "(1) the class is so numerous that joinder of all members is impracticable"; "(3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class." The numerosity requirement is clearly met and Wal-Mart does not contend otherwise.  As the Court does not reach the typicality and adequacy requirements, *ante*, at 9, n. 5, I will not discuss them either, but will simply record my agreement with the District Court's resolution of those issues.

of fact or of law, the resolution of which will advance the determination of the class members' claims.[3]

## B

The District Court, recognizing that "one significant issue common to the class may be sufficient to warrant certification," 222 F. R. D. 137, 145 (ND Cal. 2004), found that the plaintiffs easily met that test. Absent an error of law or an abuse of discretion, an appellate tribunal has no warrant to upset the District Court's finding of commonality. See *Califano* v. *Yamasaki*, 442 U. S. 682, 703 (1979) ("[M]ost issues arising under Rule 23 . . . [are] committed in the first instance to the discretion of the district court.").

The District Court certified a class of "[a]ll women employed at any Wal-Mart domestic retail store at any time since December 26, 1998." 222 F. R. D., at 141–143 (internal quotation marks omitted). The named plaintiffs, led by Betty Dukes, propose to litigate, on behalf of the class, allegations that Wal-Mart discriminates on the basis of gender in pay and promotions. They allege that the company "[r]eli[es] on gender stereotypes in making employment decisions such as . . . promotion[s] [and] pay." App. 55a. Wal-Mart permits those prejudices to infect personnel decisions, the plaintiffs contend, by leaving pay and promotions in the hands of "a nearly all male managerial workforce" using "arbitrary and subjective criteria." *Ibid.* Further alleged barriers to the advancement of female employees include the company's requirement, "as a condition of promotion to management jobs, that em-

---

[3] The Court suggests Rule 23(a)(2) must mean more than it says. See *ante*, at 8–10. If the word "questions" were taken literally, the majority asserts, plaintiffs could pass the Rule 23(a)(2) bar by "[r]eciting . . . questions" like "Do all of us plaintiffs indeed work for Wal-Mart?" *Ante*, at 9. Sensibly read, however, the word "questions" means disputed issues, not any utterance crafted in the grammatical form of a question.

ployees be willing to relocate." *Id.*, at 56a. Absent in-
struction otherwise, there is a risk that managers will act
on the familiar assumption that women, because of their
services to husband and children, are less mobile than
men. See Dept. of Labor, Federal Glass Ceiling Commis-
sion, Good for Business: Making Full Use of the Nation's
Human Capital 151 (1995).

Women fill 70 percent of the hourly jobs in the retailer's
stores but make up only "33 percent of management em-
ployees." 222 F. R. D., at 146. "[T]he higher one looks in
the organization the lower the percentage of women." *Id.*,
at 155. The plaintiffs' "largely uncontested descriptive
statistics" also show that women working in the company's
stores "are paid less than men in every region" and "that
the salary gap widens over time even for men and women
hired into the same jobs at the same time." *Ibid.*; cf.
*Ledbetter* v. *Goodyear Tire & Rubber Co.*, 550 U. S. 618,
643 (2007) (GINSBURG, J., dissenting).

The District Court identified "systems for . . . promoting
in-store employees" that were "sufficiently similar across
regions and stores" to conclude that "the manner in which
these systems affect the class raises issues that are com-
mon to all class members." 222 F. R. D., at 149. The
selection of employees for promotion to in-store manage-
ment "is fairly characterized as a 'tap on the shoulder'
process," in which managers have discretion about whose
shoulders to tap. *Id.*, at 148. Vacancies are not regularly
posted; from among those employees satisfying minimum
qualifications, managers choose whom to promote on the
basis of their own subjective impressions. *Ibid.*

Wal-Mart's compensation policies also operate uniformly
across stores, the District Court found. The retailer leaves
open a $2 band for every position's hourly pay rate. Wal-
Mart provides no standards or criteria for setting wages
within that band, and thus does nothing to counter uncon-
scious bias on the part of supervisors. See *id.*, at 146–147.

Wal-Mart's supervisors do not make their discretionary decisions in a vacuum. The District Court reviewed means Wal-Mart used to maintain a "carefully constructed . . . corporate culture," such as frequent meetings to reinforce the common way of thinking, regular transfers of managers between stores to ensure uniformity throughout the company, monitoring of stores "on a close and constant basis," and "Wal-Mart TV," "broadcas[t] . . . into all stores." *Id*., at 151–153 (internal quotation marks omitted).

The plaintiffs' evidence, including class members' tales of their own experiences,[4] suggests that gender bias suffused Wal-Mart's company culture. Among illustrations, senior management often refer to female associates as "little Janie Qs." Plaintiffs' Motion for Class Certification in No. 3:01–cv–02252–CRB (ND Cal.), Doc. 99, p. 13 (internal quotation marks omitted). One manager told an employee that "[m]en are here to make a career and women aren't." 222 F. R. D., at 166 (internal quotation marks omitted). A committee of female Wal-Mart executives concluded that "[s]tereotypes limit the opportunities offered to women." Plaintiffs' Motion for Class Certification in No. 3:01–cv–02252–CRB (ND Cal.), Doc. 99, at 16 (internal quotation marks omitted).

Finally, the plaintiffs presented an expert's appraisal to show that the pay and promotions disparities at Wal-Mart "can be explained only by gender discrimination and not by . . . neutral variables." 222 F. R. D., at 155. Using regression analyses, their expert, Richard Drogin, con-

---

[4] The majority purports to derive from *Teamsters* v. *United States*, 431 U. S. 324 (1977), a rule that a discrimination claim, if accompanied by anecdotes, must supply them in numbers proportionate to the size of the class. *Ante*, at 17–18. *Teamsters*, the Court acknowledges, see *ante*, at 18, n. 9, instructs that statistical evidence alone may suffice, 431 U. S., at 339; that decision can hardly be said to establish a numerical floor before anecdotal evidence can be taken into account.

trolled for factors including, *inter alia*, job performance, length of time with the company, and the store where an employee worked.  *Id.*, at 159.[5]  The results, the District Court found, were sufficient to raise an "inference of discrimination."  *Id.*, at 155–160.

## C

The District Court's identification of a common question, whether Wal-Mart's pay and promotions policies gave rise to unlawful discrimination, was hardly infirm.  The practice of delegating to supervisors large discretion to make personnel decisions, uncontrolled by formal standards, has long been known to have the potential to produce disparate effects.  Managers, like all humankind, may be prey to biases of which they are unaware.[6]  The risk of discrimination is heightened when those managers are predominantly of one sex, and are steeped in a corporate culture that perpetuates gender stereotypes.

The plaintiffs' allegations resemble those in one of the

---

[5] The Court asserts that Drogin showed only average differences at the "regional and national level" between male and female employees.  *Ante*, at 16 (internal quotation marks omitted).  In fact, his regression analyses showed there were disparities *within* stores.  The majority's contention to the contrary reflects only an arcane disagreement about statistical method—which the District Court resolved in the plaintiffs' favor.  222 F. R. D. 137, 157 (ND Cal. 2004).  Appellate review is no occasion to disturb a trial court's handling of factual disputes of this order.

[6] An example vividly illustrates how subjective decisionmaking can be a vehicle for discrimination.  Performing in symphony orchestras was long a male preserve.  Goldin and Rouse, Orchestrating Impartiality: The Impact of "Blind" Auditions on Female Musicians, 90 Am. Econ. Rev. 715, 715–716 (2000).  In the 1970's orchestras began hiring musicians through auditions open to all comers.  *Id.*, at 716.  Reviewers were to judge applicants solely on their musical abilities, yet subconscious bias led some reviewers to disfavor women.  Orchestras that permitted reviewers to see the applicants hired far fewer female musicians than orchestras that conducted blind auditions, in which candidates played behind opaque screens.  *Id.*, at 738.

prototypical cases in this area, *Leisner* v. *New York Tel. Co.*, 358 F. Supp. 359, 364–365 (SDNY 1973). In deciding on promotions, supervisors in that case were to start with objective measures; but ultimately, they were to "look at the individual as a total individual." *Id.*, at 365 (internal quotation marks omitted). The final question they were to ask and answer: "Is this person going to be successful in our business?" *Ibid.* (internal quotation marks omitted). It is hardly surprising that for many managers, the ideal candidate was someone with characteristics similar to their own.

We have held that "discretionary employment practices" can give rise to Title VII claims, not only when such practices are motivated by discriminatory intent but also when they produce discriminatory results. See *Watson* v. *Fort Worth Bank & Trust*, 487 U. S. 977, 988, 991 (1988). But see *ante*, at 17 ("[P]roving that [a] discretionary system has produced a . . . disparity *is not enough*."). In *Watson*, as here, an employer had given its managers large authority over promotions. An employee sued the bank under Title VII, alleging that the "discretionary promotion system" caused a discriminatory effect based on race. 487 U. S., at 984 (internal quotation marks omitted). Four different supervisors had declined, on separate occasions, to promote the employee. *Id.*, at 982. Their reasons were subjective and unknown. The employer, we noted "had not developed precise and formal criteria for evaluating candidates"; "[i]t relied instead on the subjective judgment of supervisors." *Ibid.*

Aware of "the problem of subconscious stereotypes and prejudices," we held that the employer's "undisciplined system of subjective decisionmaking" was an "employment practic[e]" that "may be analyzed under the disparate impact approach." *Id.*, at 990–991. See also *Wards Cove Packing Co.* v. *Atonio*, 490 U. S. 642, 657 (1989) (recognizing "the use of 'subjective decision making'" as an "em-

ployment practic[e]" subject to disparate-impact attack).

The plaintiffs' allegations state claims of gender dis-
crimination in the form of biased decisionmaking in both
pay and promotions. The evidence reviewed by the Dis-
trict Court adequately demonstrated that resolving those
claims would necessitate examination of particular poli-
cies and practices alleged to affect, adversely and globally,
women employed at Wal-Mart's stores. Rule 23(a)(2),
setting a necessary but not a sufficient criterion for class-
action certification, demands nothing further.

## II
## A

The Court gives no credence to the key dispute common
to the class: whether Wal-Mart's discretionary pay and pro-
motion policies are discriminatory. See *ante*, at 9 ("Re-
citing" questions like "Is [giving managers discretion over
pay] an unlawful employment practice?" "is not suffi-
cient to obtain class certification."). "What matters," the
Court asserts, "is not the raising of common 'questions,'"
but whether there are "[d]issimilarities within the pro-
posed class" that "have the potential to impede the genera-
tion of common answers." *Ante*, at 9–10 (quoting Na-
gareda, Class Certification in the Age of Aggregate Proof,
84 N. Y. U. L. Rev. 97, 132 (2009); some internal quotation
marks omitted).

The Court blends Rule 23(a)(2)'s threshold criterion
with the more demanding criteria of Rule 23(b)(3), and
thereby elevates the (a)(2) inquiry so that it is no longer
"easily satisfied," 5 J. Moore et al., Moore's Federal Prac-
tice §23.23[2], p. 23–72 (3d ed. 2011).[7] Rule 23(b)(3) certi-

---

[7]The Court places considerable weight on *General Telephone Co. of
Southwest* v. *Falcon*, 457 U. S. 147 (1982). *Ante*, at 12–13. That case
has little relevance to the question before the Court today. The lead
plaintiff in *Falcon* alleged discrimination evidenced by the company's
failure to promote him and other Mexican-American employees and

fication requires, in addition to the four 23(a) findings, determinations that "questions of law or fact common to class members predominate over any questions affecting only individual members" and that "a class action is superior to other available methods for . . . adjudicating the controversy."[8]

The Court's emphasis on differences between class members mimics the Rule 23(b)(3) inquiry into whether common questions "predominate" over individual issues. And by asking whether the individual differences "impede" common adjudication, *ante*, at 10 (internal quotation marks omitted), the Court duplicates 23(b)(3)'s question whether "a class action is superior" to other modes of adjudication. Indeed, Professor Nagareda, whose "dissimi-

_____

failure to hire Mexican-American applicants. There were "*no* common questions of law or fact" between the claims of the lead plaintiff and the applicant class. 457 U. S., at 162 (Burger, C. J., concurring in part and dissenting in part) (emphasis added). The plaintiff-employee alleged that the defendant-employer had discriminated against him intentionally. The applicant class claims, by contrast, were "advanced under the 'adverse impact' theory," *ibid.*, appropriate for facially neutral practices. "[T]he only commonality [wa]s that respondent is a Mexican-American and he seeks to represent a class of Mexican-Americans." *Ibid.* Here the same practices touch and concern all members of the class.

[8]"A class action may be maintained if Rule 23(a) is satisfied and if:

"(1) prosecuting separate actions by or against individual class members would create a risk of . . . inconsistent or varying adjudications . . . [or] adjudications with respect to individual class members that, as a practical matter, would be dispositive of the interests of the other members . . . ;

"(2) the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief . . . is appropriate respecting the class as a whole; or

"(3) the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. Rule Civ. Proc. 23(b) (paragraph breaks added).

larities" inquiry the Court endorses, developed his position in the context of Rule 23(b)(3). See 84 N. Y. U. L. Rev., at 131 (Rule 23(b)(3) requires "some decisive degree of similarity across the proposed class" because it "speaks of common 'questions' that 'predominate' over individual ones").[9] "The Rule 23(b)(3) predominance inquiry" is meant to "tes[t] whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem Products, Inc.* v. *Windsor,* 521 U. S. 591, 623 (1997). If courts must conduct a "dissimilarities" analysis at the Rule 23(a)(2) stage, no mission remains for Rule 23(b)(3).

Because Rule 23(a) is also a prerequisite for Rule 23(b)(1) and Rule 23(b)(2) classes, the Court's "dissimilarities" position is far reaching. Individual differences should not bar a Rule 23(b)(1) or Rule 23(b)(2) class, so long as the Rule 23(a) threshold is met. See *Amchem Products*, 521 U. S., at 623, n. 19 (Rule 23(b)(1)(B) "does not have a predominance requirement"); *Yamasaki*, 442 U. S., at 701 (Rule 23(b)(2) action in which the Court noted that "[i]t is unlikely that differences in the factual background of each claim will affect the outcome of the legal issue"). For example, in *Franks* v. *Bowman Transp. Co.*, 424 U. S. 747 (1976), a Rule 23(b)(2) class of African-American truckdrivers complained that the defendant had discriminatorily refused to hire black applicants. We recognized that the "qualification[s] and performance" of individual class members might vary. *Id.*, at 772 (internal quotation marks omitted). "Generalizations concerning such individually applicable evidence," we cautioned, "cannot serve as a justification for the denial of [injunc-

---

[9] Cf. *supra*, at 2 (Rule 23(a) commonality prerequisite satisfied by "[e]ven a single question . . . common to the members of the class" (quoting Nagareda, The Preexistence Principle and the Structure of the Class Action, 103 Colum. L. Rev. 149, 176, n. 110 (2003)).

tive] relief to the entire class." *Ibid.*

## B

The "dissimilarities" approach leads the Court to train its attention on what distinguishes individual class members, rather than on what unites them. Given the lack of standards for pay and promotions, the majority says, "demonstrating the invalidity of one manager's use of discretion will do nothing to demonstrate the invalidity of another's." *Ante*, at 15.

Wal-Mart's delegation of discretion over pay and promotions is a policy uniform throughout all stores. The very nature of discretion is that people will exercise it in various ways. A system of delegated discretion, *Watson* held, is a practice actionable under Title VII when it produces discriminatory outcomes. 487 U. S., at 990–991; see *supra*, at 7–8. A finding that Wal-Mart's pay and promotions practices in fact violate the law would be the first step in the usual order of proof for plaintiffs seeking individual remedies for company-wide discrimination. *Teamsters* v. *United States*, 431 U. S. 324, 359 (1977); see *Albemarle Paper Co.* v. *Moody*, 422 U. S. 405, 415–423 (1975). That each individual employee's unique circumstances will ultimately determine whether she is entitled to backpay or damages, §2000e–5(g)(2)(A) (barring backpay if a plaintiff "was refused . . . advancement . . . for any reason other than discrimination"), should not factor into the Rule 23(a)(2) determination.

\*   \*   \*

The Court errs in importing a "dissimilarities" notion suited to Rule 23(b)(3) into the Rule 23(a) commonality inquiry. I therefore cannot join Part II of the Court's opinion.